WINGER'S DEPARTMENT STORE, INC., PETITIONER *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10866–81.    Filed June 4, 1984.

*Michael P. Casterton* and *Alvin R. Wohl,* for the petitioner. *Ray K. Kamikawa,* for the respondent.

STERRETT, *Judge:* Respondent, in his notice of deficiency dated April 6, 1981, determined deficiencies of $22,704, $25,505, $22,943, and $15,302 in petitioner's Federal income

taxes for the years 1976, 1977, 1978, and 1979, respectively. After concessions by the parties, the issue remaining for decision is whether the trust created under petitioner's pension plan for employees was a qualified trust within the meaning of section 401(a), I.R.C. 1954, during the taxable years 1977, 1978, and 1979.[1]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Petitioner Winger's Department Store, Inc., is a California corporation, which had its principal place of business at the time of the filing of its petition herein in Davis, Calif. For the taxable years 1976, 1977, 1978, and 1979, petitioner timely filed its Federal corporate income tax returns with the appropriate office of the District Director of Internal Revenue.

Richard C. Winger (hereinafter referred to as Winger) was president and sole stockholder of petitioner prior to and during the years in issue.

On or about December 30, 1976, petitioner adopted the Winger's Department Store, Inc., Defined Benefit Pension Plan and Defined Benefit Pension Retirement Plan Trust (hereinafter referred to as the pension plan and the trust), intended to be effective January 1, 1976. On or about December 30, 1976, petitioner submitted an Application for Determination for Defined Benefit Plan, Form 5300, to respondent seeking qualification of the pension plan under section 401(a). On March 22, 1978, respondent issued a favorable determination letter relative to the qualification of the pension plan under section 401(a). The determination letter was conditional upon the timely adoption of proposed amendments dated December 22, 1977. These amendments were adopted by petitioner on March 24, 1978.

---

[1]Petitioner has admitted to the correctness of respondent's determination of the $22,704 deficiency for the taxable year 1976 by failing to reply to respondent's request for admissions. This admission was confirmed by the Court at trial. The deficiency was based on respondent's determination that petitioner's contribution of $52,941.41 to its pension plan was not deductible in 1976 because it was not paid to the plan within the time prescribed by law. In the event we find that petitioner's pension plan is a qualified plan, carryover contribution amounts deductible under sec. 404(a)(7) will be the subject of a Rule 155 computation.

The trustees of the pension plan were Winger and his wife, Diane Winger. Most of the pension benefits under the plan accrue to Winger, because of his length of service, age, and salary. In 1977, 10 out of a total of 15 employees were eligible to participate in the plan. In 1978, 10 out of a total of 21 employees were eligible to participate in the plan. In 1979, 11 out of a total of 16 employees were eligible to participate in the plan. The present value of Winger's accrued benefits under the pension plan as of December 31, 1977 and 1978, was $108,998 and $180,701, respectively. The present value of accrued benefits for the remaining participants as of December 31, 1977 and 1978, was $27,041 and $49,919, respectively.[2] Prior to 1979, none of the employees had vested interests in their plan benefits. In 1979 four participants, including Winger, had partially vested interests.

Under the terms of petitioner's pension plan and trust, each participant had the right, subject to the discretion of the trustee, to borrow from the trust up to 100 percent of his accrued benefit, or $750,000, without regard to the amount of the participant's vested interest in his accrued benefit. The trustee was required to make any loans in a nondiscriminatory manner, to require adequate security for each loan, and to charge interest at the prevailing rate for such type of secured loan. Loans were required to be evidenced by a promissory note providing for a definite method of repayment, dates payments were due, and the date the balance of the note was due.

On or about December 30, 1976, petitioner made an initial contribution of $8,000 to the pension plan, which was deposited into the pension plan checking account at Security Pacific National Bank, Davis, Calif.

On or about June 20, 1977, petitioner issued a check in the amount of $52,941.41 to its pension plan as its employer pension contribution for the 1976 year.[3] This check was deposited in the pension plan checking account at Security Pacific National Bank on or about June 29, 1977. On June 29, 1977, the pension plan issued a check in the amount of $52,941.41 to Winger in exchange for a promissory note

---

[2] No comparable date are available for the 1979 year.

[3] It has been determined that the contribution was not properly deductible in the taxable year 1976. See note 1 *supra*.

executed by Winger. The note was dated June 15, 1977, due on June 15, 1978, in the amount of $52,941.41, bearing interest at the rate of 10-percent per annum, without provision for security. A notation on the back of this note indicated that it was renewed on June 15, 1978, to a date not stated. The $52,941.41 check issued by the pension plan to Winger was deposited into Winger's checking account at the Security Pacific National Bank on June 29, 1977. On the same day, Winger issued a check in the amount of $52,941.41 to petitioner, which petitioner deposited in its checking account at the Security Pacific National Bank. In return, Winger received a note from petitioner, dated June 15, 1977, due on demand but not later than June 15, 1980, in the amount of $52,941.41, bearing interest at the rate of 8-percent per annum. The note was signed on behalf of petitioner by Winger and Richard J. Rose, secretary of petitioner (hereinafter referred to as Rose).

On or about April 4, 1978, petitioner issued a check in the amount of $70,000 to the pension plan as its employer pension contribution for the 1977 year. This check was deposited into the pension plan checking account at Security Pacific National Bank on or about April 4, 1978. On or about the same date, the pension plan issued a check in the amount of $55,000 to Winger in exchange for a promissory note executed by Winger. The note was dated April 4, 1978, due on April 4, 1979, in the amount of $55,000, bearing interest at the rate of 10-percent per annum, without provision for security. The $55,000 check issued by the pension plan to Winger was deposited in Winger's checking account at the Security Pacific National Bank on or about April 4, 1978. On or about the same day, Winger issued a check to petitioner in the amount of $75,000, which petitioner deposited in its checking account at the Security Pacific National Bank. Winger received a note from petitioner dated March 15, 1978, due upon demand but not later than March 15, 1981, in the amount of $75,000, bearing interest at the rate of 8-percent per annum.[4] The note was signed on behalf of petitioner by Winger and Rose.

On or about June 8, 1979, petitioner issued a check in the amount of $87,941.05 to the pension plan as its employer pension contribution for the 1978 year. The fate of this

[4]The Mar. 15, 1978, date was apparently an error.

contribution differed slightly from that of the prior two contributions. The check was deposited on or about June 11, 1979, in the pension plan's checking account located at the First National Bank of Dixon, Davis, Calif. On June 11, 1979, the pension plan issued a check to Winger in the amount of $87,941.05 in exchange for a promissory note executed by Winger. The note was dated June 8, 1979, due on June 8, 1980, in the amount of $87,941.05, bearing interest at the rate of 10-percent per annum, without provision for security. The $87,941.05 check issued by the pension plan to Winger was endorsed to Dos Pinos Ranch and deposited in the checking account of Dos Pinos Ranch located at the First National Bank of Dixon. The Dos Pinos Ranch is a horse ranch of which Winger is the sole proprietor. The Dos Pinos Ranch checking account was used by Winger as a personal checking account. On or about June 12, 1979, Dos Pinos Ranch issued a check in the amount of $87,941.05 to petitioner, which petitioner deposited in its checking account located at the First National Bank of Dixon. Winger received a note from petitioner, dated June 11, 1979, due on demand, in the amount of $184,572.38, bearing interest at the rate of 8-percent per annum. The note, signed on behalf of petitioner by Winger and Rose, purported to consolidate all sums due and payable by petitioner to the "Richard C. Winger Family Revocable 1976 Trust."

The following table relates to the three loans made by the pension plan to Winger and shows the repayment of principal and interest, interest accrued, and interest due as of December 31, 1979:

| Loan and date | | Principal payments | | Interest payments | |
|---|---|---|---|---|---|
| $52,941 | (6/15/77) | $30,000 | (7/3/79) | $4,235.31 | (1/10/78) |
| 55,000 | (4/ 4/78) | None | | 5,051.00 | (1/17/79) |
| 87,941 | (6/ 8/79) | None | | - - - | |
| 195,882 | | 30,000 | | 9,286.31 | |

| Interest accrued to 12/31/79 | Balance due of interest |
|---|---|
| $11,955.94 | $2,269.61 |
| 9,625.00 | 9,625.00 |
| 5,129.89 | 5,129.89 |
| 26,710.83 | [5]17,024.50 |

The $17,424.52 outstanding interest as of December 12, 1979, was paid in full in November 1980. Except for the partial $30,000 repayment of principal in 1979, no other repayments of principal had been made at the time of trial. The first note contained a notation that it had been renewed. The second and third notes did not bear such a notation.

The purpose of the loans from the pension plan to Winger and then from Winger to petitioner was to meet the working capital needs of petitioner, which suffered frequent cash short cycles. The pension plan issued the loans in question to Winger as and when Winger determined that they should be issued. Winger apparently did not seek contemporaneous advice from the pension plan's consultant, Pension Services, Inc., with respect to the advisability of the loans.

Winger established a $25,000 line of credit in 1976, 1977, and 1978 with Security Pacific National Bank. Winger also established a $60,000 line of credit in August 1979 with the First National Bank of Dixon. These lines of credit were borrowed against during the years in question to supply the working capital needs of petitioner, as well as the cash needs of the Dos Pinos Ranch, whose operations frequently resulted in a negative cash flow. Winger obtained the lines of credit by meeting with his bankers, who reviewed Winger's personal financial statements. Such statements were prepared by Winger, himself, and reflected a fairly substantial net worth, which consistently increased over the years in question.

The loans from the pension plan to Winger comprised a major portion of the pension plan's trust assets. In addition to the outstanding loans to Winger, the trust assets during the years in question consisted exclusively of investments in insurance policies, two $30,000 certificates of deposit, and cash

---

[5]In the stipulation of facts, the balance due of interest is stated to be $17,424.52. We assume this figure is a mathematical error.

held in a non-interest-bearing checking account. The cash values of the life insurance contracts were borrowed against to their maximum, with the pension plan paying a 6-percent interest charge. One of the certificates of deposit was purchased by the pension plan on March 5, 1979, and the second, on July 3, 1979. Amounts held in the non-interest-bearing checking account ranged from about $16,420 to $32,000. It is not exactly clear how long the pension plan permitted cash to lie in the non-interest-bearing account, but apparently, during one approximately 10-month period, $16,420 was held in the account. The purpose for not investing the cash was to assure a ready source of capital for petitioner if the need should arise. The earnings of the trust from all investment modes as compared to net assets was approximately 1.9 percent in 1977, 4.6 percent in 1978, and 6.1 percent in 1979.

In 1979, both the Internal Revenue Service and the Department of Labor commenced audits of petitioner's pension plan and trust. After commencement of the Internal Revenue Service audit, Winger was advised by the pension plan's accounting consultant to draw up a deed of trust on Dos Pinos Ranch to secure the loans from the pension plan. The deed of trust was drawn with date of June 8, 1979, but was not recorded until February 17, 1980. Petitioner was first informed of the investigation by the Department of Labor in October 1979. The plan years involved in the Department of Labor investigation corresponded to those at issue herein. An auditor from the Department of Labor met with Winger and Rose to discuss the pension plan's operations in general and, in particular, the circumstances surrounding the loans from the pension plan to Winger. At no time did Winger mention that a deed of trust in favor of the pension plan had been drawn, notwithstanding the auditor's expressed concern over the lack of security.

On April 6, 1981, respondent issued a final revocation letter, which revoked the favorable letter of March 22, 1978, regarding the qualified status of petitioner's pension plan. Revocation was based on respondent's determination that the trust was not operated for the exclusive benefit of employees and impermissibly discriminated in favor of Winger. In his notice of deficiency to petitioner, respondent determined that petitioner's contributions to the trust for 1977, 1978, and 1979

were not deductible since the trust failed to meet the conditions of a qualified trust on or after January 1, 1977.

## OPINION

We must decide whether petitioner's pension trust satisfied the qualification requirements of section 401(a). The resolution of this issue will answer the question of whether petitioner is entitled to deduct its contributions paid into the trust.

Section 401(a) provides, in part:

(a) REQUIREMENTS FOR QUALIFICATION.—A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section—

    \*      \*      \*      \*      \*      \*      \*

(2) if under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be \* \* \* used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries \* \* \*;

    \*      \*      \*      \*      \*      \*      \*

(4) if the contributions or the benefits provided under the plan do not discriminate in favor of employees who are—
    (A) officers,
    (B) shareholders, or
    (C) highly compensated.

Section 501(a) provides that an organization described in section 401(a) is exempt from tax. Section 404(a)(1)(A) provides that contributions to a pension trust are deductible by the employer if the trust is exempt from tax under section 501(a).

In determining whether a trust is qualified under section 401(a), the operation of the trust is as relevant as its terms. *Quality Brands, Inc. v. Commissioner*, 67 T.C. 167, 174 (1976); sec. 1.401–1(b)(3), Income Tax Regs. In the instant case, respondent raises no questions regarding the terms of the trust. He revoked the qualified status of the trust, and hence its exemption, based on his determination that the operation of the trust was deficient. Specifically, respondent determined that the trust assets were diverted to purposes other than for the exclusive benefit of employees. Respondent also deter-

mined that the trust, as operated, discriminated in favor of Winger, an officer, shareholder, and highly compensated employee, by extending to him a borrowing privilege not otherwise available to other employees. Because we agree with respondent that petitioner's trust did not operate for the exclusive benefit of employees and was not a qualified trust within the meaning of section 401(a), we do not address the further issue of whether the operation of the trust was discriminatory.

Essentially, respondent's position is that the trust's investment policies were so adverse to the interests of the employees as to render its operations other than for their exclusive benefit. According to respondent, those same investment policies were intended to serve the interests of petitioner by assuring a ready source of working capital. Respondent contends that the investments lacked liquidity, diversification, and violated the rule of prudence and, therefore, failed to satisfy the standards he set forth in Rev. Rul. 69–494, 1969–2 C.B. 88. In addition, respondent points out administrative deviations from prescriptions of the plan with respect to participant loans. Specifically, respondent contends that the failure to provide for security, the failure to charge interest at the prevailing rate, and the failure to evidence in writing the extensions for interest and the renewals of principal, save for the renewal of the 1977 note, contravened the express terms of the plan provisions.

Petitioner's primary argument in response to respondent's contention that the trust's investment policies violated the exclusive benefit rule is that the trust, in making investments in the form of loans to Winger, followed the standards of fair return, liquidity, diversification, and prudence set forth in respondent's own Rev. Rul. 69–494, *supra*. Further, petitioner adamantly disputes respondent's determination that the loans to Winger were not secured. In petitioner's view, even before the deed of trust was recorded on February 27, 1980, Winger's net worth served as adequate security.

The Code sets forth no specific rules regarding the types of investments which might be considered a use of funds for, or a diversion of funds to, purposes other than for the exclusive benefit of employees or their beneficiaries. Nor do the regulations under section 401(a) set forth precise investment stan-

dards. Section 1.401–1(b)(5)(i), Income Tax Regs., simply states, in part:

(5)(i) No specific limitations are provided in section 401(a) with respect to investments which may be made by the trustees of a trust qualifying under section 401(a). Generally, the contributions may be used by the trustees to purchase any investments permitted by the trust agreement to the extent allowed by local law. * * *

Notwithstanding the statutory and regulatory failure to deal specifically with the application of the exclusive benefit rule in the context of trust investments, it is obvious that an investment policy, if not otherwise checked, effectively could make the plan serve the employer's interests or selected employees' interests to the point where the plan is no longer operated in accordance with the exclusive benefit rule embodied in section 401(a). This Court and other courts have recognized that the investment policies of an employees' trust may render disqualification appropriate in some situations. See, e.g., *Central Motor Co. v. United States*, 583 F.2d 470, 488–491 (10th Cir. 1978), revg. in part and affg. on this issue 454 F. Supp. 54 (D. N.M. 1976); *Feroleto Steel Co. v. Commissioner*, 69 T.C. 97 (1977); *Ma-Tran Corp. v. Commissioner*, 70 T.C. 158 (1978).

In 1969, respondent issued the aforenoted Rev. Rul. 69–494, setting forth his views concerning the requirements with which an exempt employees' trust must comply in order to invest funds in the stock and securities of an employer corporation. The ruling states that "The primary purpose of benefiting employees or their beneficiaries must be maintained with respect to investments of the trust funds as well as with respect to other activities of the trust. This requirement, however, does not prevent others from also deriving some benefit from a transaction with the trust." The ruling further states that a trust investment in employer stock or securities will be consistent with the exclusive benefit rule if the following four requirements are met: (1) The cost must not exceed fair market value at the time of purchase; (2) a fair return commensurate with the prevailing rate must be provided; (3) sufficient liquidity must be maintained to permit distributions in accordance with the terms of the plan; and (4) the safeguards and diversity that a prudent investor would

adhere to must be present.[6]

A series of cases beginning in the late 1970's considered the relationship of the exclusive benefit rule to trust investments. Respondent's position in all of those cases was clearly premised to some extent on the principles set forth in Rev. Rul. 69–494, *supra*, and a number of the decisions specifically discussed the ruling.

*Central Motor Co. v. United States, supra*, applies the exclusive benefit rule in the context of trust investments. In that case, the trustees of a profit-sharing trust loaned substantially all of the trust's assets to a corporation which was controlled by individuals who controlled the employer corporation. Although the borrower executed demand notes for the loans, bearing the prevailing rate of interest, the notes were unaccompanied by any written evidence of security, and there was no evidence that the borrower's assets were sufficiently liquid to pay off the loans on demand. Further, the loans were continued over a number of years without any real payment of interest or substantial repayment of principal. To determine whether the trust was operated for the exclusive benefit of the employees, the District Court applied the criteria set forth in Rev. Rul. 69–494, and held that requirements (3) and (4) of the ruling were not met and, therefore, that the operations of the trust did not satisfy the exclusive benefit rule of section 401(a). On appeal, the Tenth Circuit agreed with the taxpayer that Rev. Rul. 69–494 was not binding. Nonetheless, the court, in upholding the trial court's decision, stated that the ruling is of some evidentiary value in interpreting the statute and that the factors enumerated in the ruling are among the proper ones to weigh. 583 F.2d at 490.

This Court faced the issue of the relationship between the exclusive benefit rule and trust investments for the first time in *Feroleto Steel Co. v. Commissioner, supra*, which was decided after the District Court's decision, but before the Tenth Circuit's decision in the *Central Motor Co.* case. In *Feroleto*, the trustees of a pension trust borrowed against the cash surren-

---

[6]Respondent has not limited the investment requirements of Rev. Rul. 69–494, 1969–2 C.B. 88, to investments made in employer securities. See, e.g., Rev. Rul. 73–532, 1973–2 C.B. 128 (An employees' trust that provides the trustee with complete power to invest trust funds without regard to whether investments may be new, speculative, hazardous, adventurous, or productive of income is not designed for the exclusive benefit of employees and does not qualify under sec. 401(a).).

der values of life insurance policies held by the trust and then loaned these proceeds to the majority shareholder of the employer corporation who, in turn, loaned the proceeds to the corporation at a higher rate of interest. The majority shareholder did not adhere to the payment schedule for the loan he received from the trust, although he did make some payments to the trust. We found that the loan transactions were not for the exclusive benefit of employees because the trustees' actions were contrary to their alleged intention of protecting the trust's assets, the low interest charged the shareholder was not in the best interests of the trust, and the loans, themselves, were prohibited under the trust agreement. In holding that the loan transactions constituted a diversion of trust assets for a purpose other than the exclusive benefit of employees in violation of section 401(a)(2), we cited with approval the District Court's decision in the *Central Motor Co.* case, and noted our agreement with the District Court's reasoning that the " 'primary purpose of benefitting employees or their beneficiaries must be maintained with respect to investments of the trust funds as well as with respect to other activities of the trust.' " 69 T.C. at 107. We accordingly determined that the trust was not qualified under section 401(a) as a result of the loan transactions.

In *Ma-Tran Corp. v. Commissioner, supra,* a major portion of the assets of a profit-sharing trust was loaned to an employee, to the majority shareholder of the employer corporation, and to the employer corporation. All loans were unsecured and delinquent and no interest had been paid thereon. Further, retained funds were not profitably invested. Aside from the loan transactions, administrative deviations from the prescriptions of the plan occurred during the years in issue. On these facts, we found that the plan was not operated for the exclusive benefit of the employees and held that the trust failed to be qualified under section 401(a).

The last time we considered the relationship of the exclusive benefit rule to the investment policies of an employees' trust was in *Shelby U.S. Distributors, Inc. v. Commissioner,* 71 T.C. 874 (1979). There, 96 percent of the assets of a profit-sharing trust was invested in notes and preferred stock of the employer corporations. The Commissioner revoked the exemption of the trust on the ground that it was not operated for the exclusive

benefit of employees since the trust's investments lacked liquidity, diversification, and violated the rule of prudence. We reviewed the legislative history regarding trust investments in employer securities and noted that prior to the enactment of the Employee Retirement Income Security Act of 1974 (Pub. L. 93–406), 88 Stat. 829 (ERISA), Congress had chosen to subject such investments only to the "arm's-length" standard of section 503. Further, even when Congress decided to adopt more specific restrictions on investments as part of ERISA, it made an exception for "eligible individual account plans," the type of plan involved in the case then before us. A review of the legislative history led us to conclude that Rev. Rul. 69–494 had not acquired the force of law. We concluded that the factors of Rev. Rul. 69–494 were not determinative of the qualification of the plan there before us. We stated that, since the years in issue pre-dated the enactment of ERISA, the trust's investments were subject to the arm's-length standard of section 503, and held that under the facts of that case, the investments therein did not justify the conclusion that the trust was not operated for the exclusive benefit of employees within the meaning of section 401(a).

In the *Shelby* case, we distinguished the *Central Motor* and *Feroleto Steel* cases. We acknowledged that the trusts therein lost their exemption because of their investment practices, but stated that in each case the conclusion was justifiable without subjecting the trust to a rule of prudence or a requirement of diversification. In *Shelby*, the Commissioner did not question the ability of the employers to fulfill their obligations. The notes were secured and provided for the payment of interest, and the Commissioner did not question the adequacy of such security or the reasonableness of such interest. In addition, interest payments were in fact made, and in years subsequent to those at issue, payments on principal were made when requested.[7]

The taxable years involved in all of the foregoing cases, unlike those involved in the instant case, pre-dated the enactment of ERISA, in which Congress specifically recognized the importance of investment diversification and adher-

---

[7]See also *Bing Management Co. v. Commissioner,* T.C. Memo. 1977–403, where we rejected the Commissioner's determination that pension and profit-sharing plans were not operated for the exclusive benefit of employees.

ence to a rule of prudence in the context of employee trust administration. This Court has not heretofore considered the relationship of the exclusive benefit rule of section 401(a) to trust investments post-dating the enactment of ERISA. Nor, to the best of our knowledge, has any other court done so. Respondent would have us hold that Rev. Rul. 69–494 acquired the force of law when ERISA was enacted. We need not go so far and conclude that, under the facts of this case, the trust did not operate for the exclusive benefit of employees within the meaning of section 401(a).

The facts reveal that during the years in question, immediately following petitioner's contribution to its pension plan, a major portion, if not the full amount, of each contribution was loaned to Winger at Winger's unfettered discretion, and then cycled back into petitioner to supply petitioner with necessary working capital. Interest payments to the trust were delinquent during the years in issue and most of the principal had not been repaid even by the time of trial. Except in the case of the 1977 note, there was no written evidence of renewals of principal. Further, during the years in issue, Winger posted no security. Petitioner's contention that Winger's net worth adequately secured the loans must be categorically rejected. One's mere promise to pay, regardless of one's net worth, does not constitute security, let alone adequate security. Winger executed unsecured promissory notes. An unsecured promissory note is nothing more than a mere promise of the debtor to pay, and the ordinary meaning of security surely contemplates something more than this. *Van Products, Inc. v. Commissioner,* 40 T.C. 1018, 1024–1025 (1963). Hence, the loans to Winger did not comply with the prescriptions of the plan provision with respect to loans to participants, in that Winger gave no security, and renewals of the 1978 and 1979 notes were not evidenced in writing. Respondent argues that a further deviation from the loan provision occurred by virtue of the failure to charge Winger the prevailing rate of interest.[8] We go further because, in our view, even if the 10-percent stated interest rate could be considered the prevailing interest rate, that fact, alone, does not outweigh the risk factor created by investing a major portion of the trust assets in unsecured loans to one

---

[8]In support of his argument, respondent points out that during 1979, Winger borrowed amounts from a commercial lender, paying interest at the rate of 13 percent and 16.75 percent.

individual. Nor, in our opinion, did the recordation of the deed of trust on February 27, 1980, retroactively cure the improper operation of the pension plan under the facts of this case.

Aside from the loan transactions, the remaining assets of the trust, for the most part, were not profitably invested. Other than the notes from Winger and the two certificates of deposit purchased in 1979, the evidence before us indicates that the trust held only two other types of assets, insurance policies borrowed against to the maximum extent and cash held in a non-interest-bearing checking account. The reason for holding cash in the non-interest-bearing account, specifically, in order to assure a source of working capital for petitioner, buttresses our conclusion that the trust was not operated primarily for the benefit of employees. Rather, the trust was operated effectively to serve the needs of Winger and his wholly owned corporation, petitioner.

The instant case is clearly distinguishable from *Shelby U.S. Distributors, Inc. v. Commissioner, supra.* The notes in that case were secured, and provided for the payment of interest, the reasonableness of which was not questioned by the Commissioner. Further, interest payments were made, and at the time of trial, principal payments had been made, when requested. In the instant case, no security was provided during the years in question, interest was delinquent during those years, and at the time of trial, only $30,000 of principal had been repaid.[9]

Likewise, we believe that the Ninth Circuit's decision in *Time Oil Co. v. Commissioner,* 258 F.2d 237 (9th Cir. 1958), remanding 26 T.C. 1061 (1956), is distinguishable. That case also involved the exclusive benefit rule, but in a context not involving trust investments. The Commissioner argued that the trust was not operated for the exclusive benefit of employees, because of certain deviations from the literal terms of the plan. The Ninth Circuit viewed the deviations as "de minimis" and reversed our decision that the trust was not operated for the exclusive benefit of the employees. In the instant case, by contrast, the deviations were not *de minimis,*

---

[9]Similarly, *Bing Management Co. v. Commissioner,* T.C. Memo. 1977–403, is of no assistance to petitioner. The loans in question in that case were short-term secured loans, bearing a higher rate of interest than the trusts could have obtained if funds had been invested in any other manner and were promptly repaid with interest.

but were more in the nature of deviations "antithetical to the dictates of the plan." *Ma-Tran Corp. v. Commissioner, supra* at 168.

Having concluded that the trust did not operate for the exclusive benefit of employees within the meaning of section 401(a), it would seem to follow that the trust fails to be qualified under that section and, hence, loses its exemption from tax under section 501(a). Prior to the enactment of ERISA, such was clearly the result. "Failing to satisfy the exclusive benefit rule the trust fails to be qualified under section 401(a) and, domino fashion, fails to satisfy the requirements to section 501(a) tax exemption." *Ma-Tran Corp. v. Commissioner, supra* at 169. We believe that the same result pertains in this case, notwithstanding our recognition that various provisions of ERISA were enacted in large part to replace the plan disqualification sanction with other pecuniary sanctions.

In ERISA, Congress reacted to perceived abuses in the administration of employee benefit plans by establishing new and stricter standards of fiduciary responsibility, by providing specific requirements for plan investments, and by prohibiting certain specified transactions. Title I of ERISA contains the labor provisions of the act and sets forth rules governing the responsibility of plan fiduciaries. For example, section 404(a)(1), ERISA, requires a plan fiduciary to discharge his duties as would a prudent man acting in a like capacity; to diversify plan investments so as to minimize the risk of large loss, unless under the circumstances it is clearly prudent not to do so; and to discharge his duties in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of title I. Section 406, ERISA, sets forth a listing of prohibited transactions. Section 407, ERISA, sets forth specific limitations with respect to the acquisition and holding of employer securities and employer real property by certain plans. Section 408, ERISA, sets forth exemptions from prohibited transactions.

Violations of the labor provisions contained in ERISA may result in any number of sanctions against the fiduciary. For example, under section 409(a), ERISA, a fiduciary may be subject to personal liability to the extent of any losses suffered

by the plan resulting from a breach of duties imposed by title I and is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. Under section 502(a)(2), ERISA, a civil action for relief under section 409, ERISA, may be brought by the Secretary of Labor, by a plan participant, or by a beneficiary.

Title II of ERISA contains amendments to the Internal Revenue Code relating to retirement plans. Prior to ERISA, a qualified plan could become disqualified if the trust engaged in certain prohibited transactions described in section 503. The prohibited transactions described in section 503(b)(1) and (b)(6) included the lending of any part of the income or corpus of a qualified trust to certain specified persons without the receipt of adequate security or a reasonable rate of interest, and the engaging in any other transaction which resulted in a substantial diversion of income or corpus to certain specified persons. Section 503 was amended by ERISA so that, in general, it no longer applies to qualified plans, and the kind of conduct theretofore the target of section 503, became subject to graduated penalties in the form of excise taxes under section 4975. The prohibited transaction taxes are imposed on any "disqualified person" who participates in the transaction. The congressional intent underlying the change in sanctions is expressed as follows:

Under present law, if a prohibited transaction occurs, a plan (and trust) loses its exemption from taxation. If a trust is disqualified because of an act of the trustee and the employer, then the income tax imposed on the trust may be paid out of funds otherwise available to provide employees' retirement benefits and the sanction may then fall on innocent employees. To correct this problem in the future, the substitute eliminates disqualification and instead would impose an excise tax sanction for a violation of the prohibited transactions provisions. [H. Rept. 93–1280 (Conf.), 322 (1974), 1974–3 C.B. 483.]

The alternative sanctions imposed with respect to improper trust administration either under the labor provisions of ERISA or under section 4975 of the Internal Revenue Code were obviously an attempt by Congress to deal with, in a more refined manner, certain actions which might otherwise result in a loss of tax-qualified status. The ERISA sanctions punish those persons who actually take part in an improper transaction rather than all participants. However, we do not believe

that ERISA negatively implies that the Internal Revenue Service (IRS) no longer has responsibility for enforcing the exclusive benefit rule in situations involving improper trust administration.

There is nothing in the legislative history to lead us to conclude that Congress, in enacting fiduciary standards and sanctions for the violation thereof in the labor provisions of ERISA, intended to vest the Department of Labor (DOL), to the exclusion of the Internal Revenue Service, with the sole jurisdiction over matters relating to employee trust administration, including trust investment decisions. There is no question but that improper trust administration and investment policies may adversely impact on the exclusive benefit rule. This rule is embodied in the tax laws, specifically in section 401(a), the jurisdiction over which lies with the Internal Revenue Service absent some express provision of the law to the contrary. Secs. 7801, 7802, 7805. The clear implication in the legislative history, as illustrated in the following passage, is that Congress intended for the DOL and the IRS to share the responsibility of overseeing the administration of employee plans through the enforcement of the laws in their respective realms of jurisdiction:

> Under the Internal Revenue Code, qualified retirement plans must be for the exclusive benefit of the employees and their beneficiaries. Following this requirement, the Internal Revenue Service has developed general rules that govern the investment of plan assets, including a requirement that cost must not exceed fair market value at the time of purchase, there must be a fair return commensurate with the prevailing rate, sufficient liquidity must be maintained to permit distributions, and the safeguards and diversity that a prudent investor would adhere to must be present. The conferees intend that to the extent that a fiduciary meets the prudent man rule of the labor provisions, he will be deemed to meet these aspects of the exclusive benefit requirements under the Internal Revenue Code. [H. Rept. 93–1280 (Conf.), at 302 (1974), *supra*, 1974–3 C.B. at 463.]

Any doubts that we might otherwise have regarding the effect of ERISA on the Internal Revenue Service's responsibility for enforcing the exclusive benefit rule in the context of trust administration is completely dispelled by the enactment of section 103 of the Reorganization Plan No. 4 1978, 43 Fed. Reg. 47113, 92 Stat. 3790, 1979–1 C.B. 480. Section 103 of the Reorganization Plan requires coordination between the DOL and the Department of Treasury in the case of fiduciary

actions subject to the labor provisions of ERISA. Specifically, the Secretary of Treasury is required to notify the Secretary of Labor prior to the commencement of any proceeding to determine whether the action violates the exclusive benefit rule of section 401(a). The Secretary of Treasury shall not thereafter issue a determination of disqualification by reason of the exclusive benefit rule of section 401(a), unless within a limited time period, the Secretary of Labor certifies that he has no objection to the disqualification, or the Secretary of Labor fails to respond to the Secretary of Treasury. Obviously, had the sanctions in the labor provisions of ERISA been intended to preempt the sanction of disqualification, there would have been no need to enact section 103 of the Reorganization Plan.

Nor do we believe that the excise tax sanction in section 4975 was intended to preempt the sanction of disqualification under the exclusive benefit rule in the case now before us. We are not herein dealing with any isolated prohibited transaction described in section 4975. Rather, our decision that petitioner's trust did not operate for the exclusive benefit of employees is based on a totality of the transgressions that occurred and pervaded the entire operations of the trust. The fact that some of those transgressions are described specifically in section 4975 and made subject to an excise tax is merely fortuitous.[10]

In view of the foregoing, we hold that, because petitioner's pension plan did not operate for the exclusive benefit of employees during 1977, 1978, and 1979, it failed to be qualified during those years under section 401(a) and hence failed to satisfy the requirements of section 501(a) tax exemption. Therefore, petitioner's contributions to the trust for the years 1977, 1978, and 1979 are not deductible under section 404(a)(1).

We do not intend by this holding to encourage the respondent to bring a slew of actions seeking disqualification under the exclusive benefit rule. Given the broad range of alternative remedies available to both the DOL and the IRS to ensure proper trust administration, it is assumed that the IRS will

---

[10]One might argue that any prohibited transaction as described in sec. 4975 is by its very nature a violation of the exclusive benefit rule. However, the rule cannot be construed literally. *Time Oil Co. v. Commissioner*, 258 F.2d 237 (9th Cir. 1958), remanding 26 T.C. 1061 (1956). In some cases, the degree of the sanction may depend on the degree of the transgression.

exercise restrained discretion in seeking disqualification treatment. Moreover, in enacting section 103 of the Reorganization Plan, Congress, in effect, made disqualification the exception rather than the rule by requiring, in cases such as the one presently before us, communication and cooperation between the DOL, whose primary function is to protect the rights of workers, and the IRS, whose primary function is to protect the revenue.

*Decision will be entered under Rule 155.*