106 T.C. No. 20


UNITED STATES TAX COURT


ALFRED E. GALLADE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 791-94, 792-94.          Filed May 28, 1996.


C, P's wholly owned corporation, operated a
pension plan in which P participated.  Because of C's
poor financial disposition, P executed a "waiver", to
assign his fully vested, accrued benefits to C.  Due to
the waiver, P did not report any taxable distribution.
R determined that P's waiver was an impermissible
attempt to assign or alienate his benefits in violation
of sec. 206(d)(1) of ERISA and sec. 401(a)(13), I.R.C.
     1.   Held:  P received a taxable distribution.
     2.   Held, further, the distribution was received
by P in 1986.
     3.   Held, further, R abused her discretion by
failing to waive the penalty for substantial
understatement of income tax.

Kenneth M. Barish, James R. McDaniel, and Bruce L. Ashton, for petitioner.

Paul B. Burns, for respondent.

GERBER, Judge:  Respondent alternatively determined a $540,716 income tax deficiency and a $135,179 addition to tax under section 6661[1] for the 1985 tax year, or a $537,808 income tax deficiency and a $107,562 addition to tax under section 6661 for the 1986 tax year.  The issues remaining for our consideration are:  (1) Whether petitioner's waiver of his pension plan benefits and use of them by his wholly owned corporation resulted in a taxable distribution to him; (2) if it is a taxable distribution, whether it is recognizable in 1985 or 1986; and (3) whether petitioner is liable for an addition to tax under section 6661.

## FINDINGS OF FACT[2]

Petitioner resided in Fontana, California, at the time of the trial of these consolidated cases.  Petitioner was married to Adele M. Gallade (ex-wife) during the period under consideration, except for an interim period when they were divorced (January 20

---

[1] Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years at issue, and the Rule references are the Tax Court Rules of Practice and Procedure.

[2] The stipulation of facts and exhibits are incorporated herein by this reference.

through December 29, 1979).  They separated in November 1985, and they were divorced a second time as of November 30, 1987.

In 1943, petitioner received a bachelor of science degree in philosophy.  After graduation, petitioner served in the U.S. Navy for approximately 5 years, after which he returned to the Los Angeles area to operate what he refers to as "small businesses".  In the late 1940s, petitioner began working for Hughes Aircraft Co. (Hughes) until approximately 1950, when he started a tire distribution business.  After working in this business, petitioner returned to Hughes.  Subsequently, petitioner was hired by a chemical company as a general manager in Inglewood, California.

After leaving the Inglewood chemical company, on January 2, 1970, petitioner incorporated his own chemical distribution business, Gallade Chemical, Inc. (GCI), of which he was the sole shareholder and officer.  GCI maintained its principal place of business in Santa Ana, California.  Petitioner was employed by GCI from its date of incorporation through the years in issue.

On December 1, 1970, GCI adopted a pension plan known as the "Defined Benefit Pension Plan of Gallade Chemical, Inc." (the Plan), which, at all relevant times, was qualified under section 401(a).  The First American Trust Co. (First American) was the trustee of the Plan.  Petitioner participated in the Plan from

its inception through its termination, at which time his accrued benefit was fully vested.[3]

Section 9.05 of the Plan, captioned "Nonreversion", prohibited the Plan funds from being used for any purpose other than for the exclusive benefit of the participants or their beneficiaries, except that

> Upon termination of the Plan, any assets remaining in the Trust Fund because of an erroneous actuarial computation after the satisfaction of all fixed and contingent liabilities under the Plan shall revert to the Employer.

Under the heading of "Nonassignability", section 16.03(A) stated:

> None of the benefits, payments, proceeds or claims of any Participant shall be subject to any claim of any creditor of any Participant and, in particular, the same shall not be subject to attachment or garnishment or other legal process by any creditor of any Participant, <u>nor shall any Participant have any right to alienate, anticipate, commute, pledge, encumber or assign any of the benefits or payments or proceeds which he may expect to receive under this Plan</u> (except as provided in this Plan for loans from the Trust). [Emphasis added.]

On May 20, 1985, petitioner, his sons (who were also employees of GCI), petitioner's C.P.A. Henry Zdonek (Mr. Zdonek), and a vice president of Actuarial Consultants, Inc., Scott Salisbury (Mr. Salisbury), met to review the yearend 1984

---

[3] At the Plan's termination, the present value of petitioner's accrued benefit was $1,057,830, and the Plan's total available assets at that time were $1,498,682. The present value of the accrued benefits of all other plan participants was at that time $312,469.

The parties agree that, if petitioner failed to report his distribution from the Plan, the amount should be $1,057,830 rather than $1,082,000, the amount stated in the notices of deficiency.

valuation of the original plan and profit-sharing plan (the profit-sharing plan) and to discuss the distribution owed to petitioner, as petitioner was near retirement age. The options reviewed by petitioner included his receiving a distribution from the Plan as taxable income, rolling the benefits over into an individual retirement account (IRA), or rolling the benefits over into the profit-sharing plan. At this meeting, the individuals present did not discuss the possibility of petitioner's waiving his vested plan benefits.

After the May 20, 1985, meeting, petitioner evaluated the financial needs of GCI. Amid GCI's decreasing customer base and financial losses, petitioner thought that expansion was necessary. Therefore, petitioner decided that it would be best for GCI if petitioner waived his benefits under the Plan and had the funds paid to GCI to provide the necessary working capital.

Between the meeting on May 20, 1985, and July 12, 1985, Mr. Zdonek called Mr. Salisbury and asked Mr. Salisbury to research the question of whether petitioner was permitted to waive his Plan benefits. On July 12, 1985, Mr. Salisbury prepared a memorandum to GCI's pension file which memorialized a telephone conversation between Mr. Salisbury and Juanita Nappier (Ms. Nappier), a supervisor with the Pension Benefit Guaranty Corp. (PBGC). Mr. Salisbury stated that Ms. Nappier believed that it would be fine for petitioner to waive his benefits under the Plan due to GCI's business conditions, so long as the rank and file

employees received their benefits.  Mr. Salisbury forwarded a copy of the memorandum to petitioner and Mr. Zdonek.

On August 5, 1985, Mr. Salisbury sent a letter to Mr. Zdonek, a copy of which petitioner received.  The letter confirmed that GCI desired to:  (1) Terminate the Plan; (2) pay all participants their then-accrued benefits, except for petitioner whose benefit would "revert" back to GCI; (3) create a new plan, to which the employees of GCI would transfer their Plan benefits; and (4) have a waiver of benefits prepared for petitioner.  Mr. Salisbury commented on the Plan benefits with respect to Mrs. Gallade, stating that he believed:

> temporary IRS regulations under the Retirement Equity Act of 1984, published in the Federal Register on July 19, 1985, indicate that, "...any plan that has a termination date prior to September 17, 1985 and distributes all remaining assets as soon as administratively feasible after the termination date, is not subject to the new survivor annuity requirements [of sections 401(a)(11) and 417]."  [See sec. 1.401(a)-11T, Q&A-10, Temporary Income Tax Regs., 50 Fed. Reg. 29373 (July 19, 1985).]

On September 4, 1985, GCI adopted a resolution terminating the Plan.  The resolution stated that

> [petitioner] hereby waives all his rights and benefits under * * * [the Plan] and that all such rights and benefits will revert to the Employer-Corporation upon termination of [the] plan.

The termination, which was signed by petitioner, was effective September 16, 1985.

In anticipation of the Plan's termination, on or about September 6, 1985, GCI filed an Internal Revenue Service Form

5310, Application for Determination Upon Termination; Notice of Merger, Consolidation or Transfer of Plan Assets or Liabilities; Notice of Intent to Terminate, with the PBGC. See sec. 2616.3, PBGC Regs. With the Form 5310, GCI sought a favorable determination letter from respondent, and it applied for a Notice of Sufficiency from the PBGC upon the Plan's termination.

On or about December 30, 1985, GCI opened an interest-bearing account at Republic Bank (the Republic Bank account). Petitioner and J. Ray Haynes (Mr. Haynes) of First American were the designated signatories on the Republic Bank account, and all withdrawals or disbursements required both individuals to sign. On the same day, First American deposited $771,000 of funds from the Plan into the Republic Bank account.[4]

On January 8, 1986, the PBGC issued a Notice of Sufficiency to GCI in accordance with GCI's first application. On or about January 15, 1986, the funds were withdrawn, including accrued interest (total of $772,996.44). GCI filed a second Form 5310 on or about March 5, 1986, to notify respondent and the PBGC of GCI's plans to transfer the remaining assets from the Plan to the GCI profit-sharing plan. On July 17, 1986, First American had transferred all those assets from the Plan trust, payable to all

_____

[4] Approximately $400,000 of petitioner's balance in the Plan went towards paying suppliers, which we find was distributed to petitioner in 1986. The remainder, $771,000, was deposited into the Republic Bank account, which petitioner claims was to be used at some point for GCI's expansion into the Inland Empire. The record is unclear whether such a property was ever purchased.

Plan participants except for petitioner, to the profit-sharing plan trust. First American then arranged for the remaining assets, to which petitioner was entitled, to be transferred from the Plan trust to GCI on August 18 and September 23, 1986.

During the summer 1986, respondent assigned GCI's application for a determination to an employee plans specialist. During the period July 1986 through January 1987, the specialist and GCI's representatives corresponded concerning the application. On or about March 31, 1987, the matter was submitted internally within respondent's office for technical advice regarding the Plan's termination. On June 9, 1988, respondent's national office issued a technical advice memorandum, stating its position. On or about July 27, 1988, GCI withdrew its application for a determination letter. Thereafter, this issue was addressed in the examination of petitioner which led to this controversy.

A closing conference was held on October 23, 1991, and it was attended by petitioner, respondent's agent, the agent's supervisor, and Mr. Zdonek. At this meeting, respondent's agent discussed the substantive issues and the reasons he believed that a section 6661 penalty for substantial understatement should apply. Mr. Zdonek told respondent's agent that he believed this penalty should not apply.

OPINION

Evidentiary Objections

We first consider the evidentiary objections to certain stipulated facts.  Respondent objected to the admission of certain facts concerning a settlement meeting between the parties at which petitioner's counsel asked to have the section 6661 penalty waived.  Petitioner seeks to introduce this fact solely to show that he asked respondent to waive the section 6661 penalty, not to establish liability or validity of the substantive claim.

Rule 143(a) provides that trials before this Court are to be "conducted in accordance with the rules of evidence applicable in trials without a jury in the United States District Court for the District of Columbia."  See sec. 7453.

Rule 408 of the Federal Rules of Evidence provides that evidence of an offer or promise to compromise or settle is not admissible to prove liability or validity of a claim or amount. Settlement agreements, however, are admissible if offered for a purpose other than to prove liability or a claim's validity. Wentz v. Commissioner, 105 T.C. 1, 6 (1995); Tijerina v. Josefiak, 50 Empl. Prac. Dec. (CCH) par. 38,943 (D.D.C. 1988) (citing County of Hennepin v. AFG Indus., Inc., 726 F.2d 149, 153 (8th Cir. 1984)); see also Sage Realty Corp. v. Insurance Co. of N. Am., 34 F.3d 124 (2d Cir. 1994); Johnson v. Hugo's Skateway, 974 F.2d 1408 (4th Cir. 1992).  Therefore, the fact that petitioner and respondent met is admissible for the limited

purpose of showing that petitioner asked respondent to waive the section 6661 penalty.

Petitioner reserved objections to certain stipulated facts proposed by respondent. Petitioner did not address the objections until his reply brief. Relying on <u>Midkiff v. Commissioner</u>, 96 T.C. 724, 734 (1991), affd. sub nom. <u>Noguchi v. Commissioner</u>, 992 F.2d 226 (9th Cir. 1993), respondent argues that because of petitioner's failure to address his evidentiary objections at trial or on opening brief, petitioner has abandoned the objections reserved in the parties' stipulation of facts. <u>Midkiff</u> held that objections not addressed in briefs are abandoned. While that case did not distinguish between opening and reply briefs, it would be unreasonable to allow a party to wait until filing a reply brief to address the party's objections, because it eliminates the opportunity for the adverse party to respond. We have found that petitioner in these cases waited until he filed his reply brief to address his objections; accordingly, we hold that petitioner did not preserve his objections.[5]

<u>The Plan Distribution</u>

---

[5] Despite our holding that petitioner's objections were abandoned, we note that we did not rely on the statements contained in the declarations of Bruce A. Hughes, which petitioner argued are hearsay. Furthermore, the substance of respondent's internal request for technical advice was not relevant to the legal conclusions reached in these cases.

The first substantive issue for decision is whether petitioner must include in income the value of his fully vested interest in GCI's pension plan, which he waived in favor of GCI. Petitioner asserts that the funds are not includable because of his permissible "waiver" of benefits in favor of his wholly owned corporation.

Respondent argues that petitioner must recognize taxable income from the Plan's distribution because petitioner had an unconditional right to receive the benefits, and any attempted "waiver" is invalid under the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, 88 Stat. 829, 29 U.S.C. sec. 1001, and the Internal Revenue Code (I.R.C.).

ERISA was enacted to establish "a comprehensive federal scheme for the protection of pension plan participants and their beneficiaries." American Tel. & Tel. Co. v. Merry, 592 F.2d 118, 120 (2d Cir. 1979). ERISA was intended to assure that American workers "may look forward with anticipation to a retirement with financial security and dignity, and without fear that this period of life will be lacking in the necessities to sustain them as human beings within our society." S. Rept. 93-127, at 13 (1974), 1974-3 C.B. (Supp.) 1, 13. To this end, ERISA requires that plans provide that benefits may not be assigned or alienated. H. Rept. 93-807, at 68 (1974), 1974-3 C.B. (Supp.) 236, 303. This provision is included in both the I.R.C. and ERISA section 206(d)(1), which state that a pension plan will not be qualified

if its benefits can be assigned or alienated.  Sec. 401(a)(13);
29 U.S.C. sec. 1056(d)(1) (1994).

Section 1.401(a)-13(c)(1), Income Tax Regs., provides:

(c) <u>Definition of assignment and alienation</u>--(1)
<u>In general.</u>  For purposes of this section, the terms
"assignment" and "alienation" include--

(i)  Any arrangement providing for the
payment to the employer of plan benefits which
otherwise would be due the participant under the plan,
and

(ii) Any direct or indirect arrangement
(whether revocable or irrevocable) whereby a party
acquires from a participant or beneficiary a right or
interest enforceable against the plan in, or to, all or
any part of a plan benefit payment which is, or may
become, payable to the participant or beneficiary.

Included in the Plan's terms is a clause that complies with
the aforementioned antiassignment requirement.  Specifically,
section 16.03 of the Plan contains a nonassignability clause that
includes the statement that a participant shall not "have any
right to alienate * * * the benefits or payments or proceeds
which he may expect to receive under [the] Plan".

We must decide whether petitioner's "waiver" constituted an
assignment or alienation of his benefits under the Plan in
violation of ERISA section 206(d)(1) and I.R.C. section
401(a)(13).

In light of GCI's financial difficulties, petitioner decided
that his accrued, fully vested benefit would be put to best use
by GCI.  Therefore, he executed a waiver of benefits in favor of
GCI.  Petitioner contends that ERISA's antialienation provisions

do not apply to a "waiver of a right to payment of benefits made by a designated beneficiary." We disagree.

"As a general rule, rights under an ERISA plan may not be waived or assigned". Ferris v. Marriott Family Restaurants, Inc., 878 F. Supp. 273, 277 (D. Mass. 1994) (emphasis added). The waiver here effectively changed the beneficiary of the Plan. Such a waiver of benefits is equivalent to an assignment or alienation, which is statutorily prohibited in the qualified pension plan at issue.

Petitioner argues that ERISA section 206(d)(1) and I.R.C. section 401(a)(13) simply require that plans contain some type of antialienation provision. Such provisions, however, must be given effect. By violating the statutory provisions, the Plan ceases to be qualified. "To be qualified, both a plan's terms and operations must meet the statutory requirements." Fazi v. Commissioner, 102 T.C. 695, 702 (1994); see Ludden v. Commissioner, 620 F.2d 700, 702 (9th Cir. 1980), affg. 68 T.C. 826 (1977); see also Guidry v. Sheet Metal Workers Natl. Pension Fund, 493 U.S. 365, 371 (1990) (ERISA section 206(d)(1) prohibits the assignment or alienation of pension plan benefits). GCI's amendment to the Plan providing for the waiver, if given effect, violates the antialienation requirements of ERISA section 206(d)(1) and I.R.C. section 401(a)(13).

Petitioner also argues that waivers are permissible if "knowingly and voluntarily" made; however, petitioner fails to

direct us to any authority that supports the argument that his waiver in the instant cases is valid so long as they were knowingly and voluntarily made.

We agree that when the antialienation rule does not apply, any waiver or alienation must be knowingly and voluntarily made. Pursuant to ERISA section 201(2), the antialienation rule of ERISA section 206(d)(1) does not apply to "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees"; i.e., a "top hat" plan.  29 U.S.C. sec. 1051(2) (1994); see also Modzelewski v. Resolution Trust Corp., 14 F.3d 1374, 1377 n.3 (9th Cir. 1994) (referring to the characteristics of a "top hat" plan).  However, the plan under consideration is overfunded and covers both petitioner and rank and file employees.  Therefore, whether petitioner's waiver was knowingly or voluntarily made is of no consequence because the plan was not a "top hat" plan.  Ferris v. Marriott Family Restaurants, Inc., supra.

Petitioner relies heavily on the fact that the PBGC issued a "Notice of Sufficiency" to GCI which stated that, insofar as it was concerned, the Plan's termination was acceptable. Petitioner's argument assumes that any Government approval cures a statutory defect.

The PBGC was created to ensure that participants in private pension plans would receive the benefits for which their

employers were liable.  ERISA established the PBGC to operate a mandatory insurance program that provides for benefits if a pension plan is terminated without adequate funding.  In re Pension Plan For Employees of Broadway Maintenance, 707 F.2d 647, 648 (2d Cir. 1983).

Concerning the Plan, GCI filed a Notice of Intent to Terminate with the PBGC, stating that it planned to effect the "waiver".  The PBGC then issued a Notice of Sufficiency after it determined that the Plan's assets were sufficient to discharge all obligations under the Plan.  See sec. 2617.12(c), PBGC Regs. A Notice of Sufficiency is not a determination of the Federal income tax consequences of termination; its purpose is to address plans' financial sufficiency.  Therefore, petitioner's reliance on the Notice of Sufficiency is misplaced.

Finally, petitioner contends that the Plan's excess funds could be waived by petitioner.  Petitioner argues that, pursuant to section 1.401-2(b)(2), Income Tax Regs., excess plan funds may revert back to the employer if due to actuarial error.  In this regard, petitioner argues that there was "actuarial error" because his waived funds were no longer needed to meet the obligations to the other Plan participants.

Section 1.401-2(b)(1), Income Tax Regs., provides, in relevant part:

> A balance due to an "erroneous actuarial computation" is the surplus arising because actual requirements differ from the expected requirements even though the latter were based upon previous actuarial valuations of

liabilities or determinations of costs of providing pension benefits under the plan and were made by a person competent to make such determinations in accordance with reasonable assumptions as to mortality, interest, etc., and correct procedures relating to the method of funding. For example, a trust has accumulated assets of $1,000,000 at the time of liquidation, determined by acceptable actuarial procedures using reasonable assumptions as to interest, mortality, etc., as being necessary to provide the benefits in accordance with the provisions of the plan. Upon such liquidation it is found that $950,000 will satisfy all of the liabilities under the plan. The surplus of $50,000 arises, therefore, because of the difference between the amounts actuarially determined and the amounts actually required to satisfy the liabilities. This $50,000, therefore, is the amount which may be returned to the employer as the result of an erroneous actuarial computation. If, however, the surplus of $50,000 had been accumulated as a result of a change in the benefit provisions or in the eligibility requirements of the plan, the $50,000 could not revert to the employer because such surplus would not be the result of an erroneous actuarial computation. [Emphasis added.]

"Actuarial errors" refer to clerical or mathematical mistakes regarding actuarial assumptions and methods in determining the future costs and liabilities required to meet a plan's funding. See Holland v. Valhi Inc., 22 F.3d 968, 972 (10th Cir. 1994). Petitioner argues that his 1984 decision to assign his benefits to GCI was tantamount to actuarial error. We disagree.

The amount of petitioner's benefits which he attempted to assign was part of the benefits which actuarial assumptions addressed since the Plan's inception. In accordance with the example in section 1.401-2(b)(1), Income Tax Regs., upon liquidation of the Plan, there were sufficient assets to meet the

Plan's needs, including petitioner's benefits. The surplus above all participants' needs (including petitioner's) may be excess due to actuarial error; however, this is not the issue with which we are faced. Petitioner attempted to assign only his vested benefits in the Plan, not the amount by which the Plan may have been overfunded. With respect to this amount, the second part of the example in section 1.401-2(b)(1), Income Tax Regs., is instructive. Here, the "excess" benefits that resulted from petitioner's attempted waiver exist solely because petitioner sought to change the benefit provisions of the Plan through the September 4, 1985, resolution--not because of an erroneous actuarial computation.

Petitioner caused the Plan to terminate and distribute his accrued, fully vested benefit to him individually, while he contemporaneously decided that the funds would be best utilized by GCI. Consequently, petitioner contributed the funds to his wholly owned corporation. This investment decision did not change the substantive result:  the distribution was petitioner's--not GCI's.[6]  Accordingly, the attempted waiver by petitioner in favor of GCI constitutes a taxable distribution from the Plan on its termination. See sec. 61(a)(11).[7]

---

[6] We also note that petitioner's attempted assignment would have violated the express terms of the Plan, sec. 16.03, as well as both ERISA sec. 206(d)(1) and I.R.C. sec. 401(a)(13).

[7] In these cases, petitioner was the only party who could have beneficially received the benefits from the Plan. See Lucas
(continued...)

Next, we decide in which year petitioner, a cash basis taxpayer, was required to report the Plan distribution. Respondent argues that petitioner should recognize the distribution in 1986; i.e., when it was paid to GCI. Section 1.451-1(a), Income Tax Regs., provides that "income [is] to be included in gross income for the taxable year in which [it is] actually or constructively received <u>by the taxpayer</u>" (emphasis added). See also sec. 451(a). The taxpayer here is petitioner Mr. Gallade, not GCI. We must decide whether Mr. Gallade, the taxpayer, actually or constructively received his distribution in 1986, as respondent contends, or in 1985, as respondent argues in the alternative.

Section 1.451-2(a), Income Tax Regs., concerning constructive receipt as interpreted in <u>Hornung v. Commissioner</u>, 47 T.C. 428, 434 (1967), provides that

> Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. * * *

---

[7](...continued)
v. Earl, 281 U.S. 111 (1930). In this regard, because we have held that the total distribution was taxable to petitioner in 1986 under sec. 61(a)(11), it is unnecessary to discuss the parties' assignment-of-income argument, which is another theory under which petitioner's income could be taxable. <u>Id.</u>

Petitioner directed GCI to open the Republic Bank account on December 30, 1985, at which time $771,000 was deposited.[8]  Both petitioner and Mr. Haynes of First American were signatories of the Republic Bank account, and both individuals were required to sign for a transaction.  Therefore, we must determine whether this two-signature requirement posed a substantial limitation or restriction on petitioner's control of the funds.

In Estate of Fairbanks v. Commissioner, 3 T.C. 260 (1944), the decedent was entitled to receive annual delay rentals from Sun Oil Co., which she specifically devised to her four children and surviving husband.  Because a dispute arose between decedent's husband and her executors, in 1940, the Sun Oil Co. deposited the rentals in a joint bank account that required the signatures of decedent's husband and her executors before any withdrawals could be made.  The Court held that the estate was not required to recognize income in 1940, stating that "these delay rentals were not paid to * * * [the] executors, but, on the contrary, were paid by the Sun Oil Co. to the * * * [bank], and were deposited in that bank to a new account" of which decedent's husband and her executors were joint signatories.  This Court stressed that, in order for the executors to make a withdrawal, they needed the signature of decedent's husband.  The opinion concluded that this was enough of a restriction on the account to

---

[8] See supra note 4.

preclude the estate from recognizing income in 1940; i.e., when the funds were deposited in the account.  Id. at 266, 267.

We believe that the same analysis should apply in these cases.  In Estate of Fairbanks v. Commissioner, supra, the bank account was established by the payor Sun Oil Co., not by either of the joint signatories.  However, we believe that the relevant holding in that case was that the taxpayer estate did not have the type of unfettered control which would trigger income recognition.  Petitioner here did not have exclusive control over the funds until 1986.  In fact, any action required the signature of a vice president of the Plan's trustee, First American, who had a fiduciary duty to act in the Plan's best interests, which we believe the Plan's trustee recognized in his dealings with the Plan.  See generally Friend v. Sanwa Bank California, 35 F.3d 466 (9th Cir. 1994); see also Winger's Dept. Store, Inc. v. Commissioner, 82 T.C. 869, 884 (1984).  Petitioner could not unilaterally remove the funds in the Republic Bank account.  This was a substantial restriction on petitioner's ability to withdraw funds, and it prevented petitioner from having constructively received the distribution in 1985.  Instead, petitioner was taxable on the $771,000 for the 1986 tax year.

Substantial Understatement

Respondent also determined that petitioner is liable for the addition to tax for substantial understatement of income tax in 1985 or 1986.  Income tax is substantially understated if, in any

year, the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or $5,000. Sec. 6661(b)(1)(A). Section 6661(a) provides for an addition to tax equal to 25 percent of the amount of any underpayment attributable to such understatement. Pallottini v. Commissioner, 90 T.C. 498 (1988).

The understatement is reduced by that portion for which there is "substantial authority" or that has been "adequately disclosed". Sec. 6661(b)(2)(B). Petitioner did not disclose the transaction at issue on his 1985 or 1986 Federal income tax returns, so there could not have been adequate disclosure. Moreover, to show that he had substantial authority, petitioner must demonstrate that the substantial weight of authority supports the positions taken on his income tax return. Sec. 1.6661-3(b)(1), Income Tax Regs.; see also Nestle Holdings, Inc. v. Commissioner, T.C. Memo. 1995-441. Petitioner has not shown this Court any authority for his tax positions. Furthermore, opinions of tax professionals may not constitute such authority. See, e.g., sec. 1.6661-3(b)(2), Income Tax Regs. In this case, there was no "substantial authority".

Section 6661(c) provides that the Secretary may waive this penalty "on a showing by the taxpayer that there was reasonable cause for the understatement * * * and that the taxpayer acted in good faith." The denial of a waiver under section 6661(c) is reviewable by this Court, and the appropriate standard of review

is whether respondent has abused her discretion in not waiving the addition to tax. Mailman v. Commissioner, 91 T.C. 1079, 1083 (1988). If we conclude that respondent's discretion was exercised arbitrarily, capriciously, or without a sound basis in fact, we will not sustain the determination. Karr v. Commissioner, 924 F.2d 1018, 1026 (11th Cir. 1991), affg. Smith v. Commissioner, 91 T.C. 733 (1988).

We have found that petitioner met with his sons (former GCI employees) to discuss the future of the Plan. In May 1985, when petitioner determined that his distribution could benefit GCI's operations, he took several steps to assure that the assignment would comply with the law. First, petitioner sought the advice of his C.P.A., Mr. Zdonek, and an actuary, Mr. Salisbury. Mr. Salisbury then formally contacted Ms. Nappier of the PBGC, who stated in writing that she believed petitioner's "waiver" would be fine. To comply with GCI's filing requirements, petitioner caused his wholly owned company to file Forms 5310 with respondent and the PBGC.

In August 1985, Mr. Salisbury informed petitioner that he believed that temporary IRS regulations indicated that, with the Plan's termination date, the Plan would not be subject to the new survivor annuity requirements. Based on the above advice, GCI adopted the resolution where petitioner agreed to waive his benefits under the Plan. Finally, in January 1986, the PBGC

issued a Notice of Sufficiency to GCI in accordance with its first application.

The most important factor in determining whether petitioner acted in a reasonable manner and in good faith is the extent to which he attempted to determine his proper income tax liability. Mailman v. Commissioner, supra at 1084. Reliance on the advice of professionals is tantamount to acting in a reasonable manner if "under all the circumstances, such reliance [is] reasonable and the taxpayer acted in good faith." Sec. 1.6661-6(b), Income Tax Regs.; see also Vorsheck v. Commissioner, 933 F.2d 757, 759 (9th Cir. 1991); Shelton v. Commissioner, 105 T.C. 114, 125 (1995); Nestle Holdings, Inc. v. Commissioner, supra.

On the basis of these facts, we find that petitioner did act as an ordinarily prudent person in the circumstances. Accordingly, his reliance on the advice of his hired professionals was reasonable and in good faith. Therefore, we hold that respondent abused her discretion by failing to waive this penalty. Accordingly, we hold that petitioner is not liable for the section 6661 addition to tax. See, e.g., Nestle Holdings, Inc. v. Commissioner, supra (holding that it was unreasonable in that case to penalize a taxpayer for relying on the advice of a professional or for not prevailing in this Court).

Citing Reinke v. Commissioner, 46 F.3d 760, 765 (8th Cir. 1995), affg. T.C. Memo. 1993-197, respondent argues that

petitioner was required to request a "waiver" of the addition to tax, and, because he did not, he is precluded from receiving one. We disagree.  While the Court of Appeals for the Eighth Circuit suggests that a taxpayer's request for a waiver can establish the Commissioner's degree of fault for failing to waive, it does not hold that a request is a requirement or prerequisite for a waiver.

Petitioner's C.P.A., Mr. Zdonek, stated that he believed that the addition to tax did not apply; however, he did not refer to respondent's "waiving" the addition to tax.  We hold that Mr. Zdonek's statement at the meeting which challenged the addition to tax had the same effect as a request for a waiver of the addition to tax, although such a formal request is not required. Id.  The paramount question is whether petitioner had reasonable cause and acted in good faith, which he did.

Decisions will be entered

under Rule 155.