ADA ORTHOPEDIC, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ada Orthopedic, Inc. v. Commissioner
Docket No. 14112-93R
United States Tax Court
T.C. Memo 1994-606; 1994 Tax Ct. Memo LEXIS 614; 68 T.C.M. (CCH) 1392; December 12, 1994, Filed *614 Decision will be entered for respondent. For petitioner: Clarke L. Randall and James W. Bruce. For respondent: C. Glenn McLoughlin. RAUM
RAUM
MEMORANDUM OPINION RAUM, Judge: This case involves the revocation of a prior favorable determination regarding the qualification of petitioner's defined benefit pension plan under section 401(a)[1] for the plan year ending June 30, 1986, and all subsequent years. The revocation letter was based on a determination that the pension plan was not managed for the exclusive benefit of the employees as required by section 401(a)(2). The case is before us on a petition for a declaratory judgment under section 7476 and Rule 217. The parties filed a joint stipulation as to the completeness and correctness of the administrative record, and submitted the case for determination under Rule 122. *615 Petitioner, Ada Orthopedic, Inc., is a professional corporation organized and existing under the laws of the State of Oklahoma. Petitioner had its principal place of business in Ada, Oklahoma, at the time of the filing of its petition. On November 30, 1978, petitioner adopted the Ada Orthopedic Inc. Defined Benefit Pension Plan (the Plan) to be a qualified plan under section 401(a). On June 29, 1983, petitioner amended the Plan, effective July 1, 1983, (First Amendment) to comply with the provisions of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324. On December 31, 1986, petitioner again amended the Plan, effective July 1, 1984, (Second Amendment) to comply with the provisions of the Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 494, and the provisions of the Retirement Equity Act of 1984, Pub. L. 98-397, 98 Stat. 1426. On September 18, 1987, the District Director for the district in which the petitioner is located issued a favorable determination letter to petitioner regarding the Plan. The determination letter found that the Plan satisfied the qualification requirements of section 401(a). The September 18, 1987, determination letter *616 specifically stated: Continued qualification of the plan will depend on its effect in operation under its present form. (See section 1.401-1(b)(3) of the Income Tax Regulations.) The status of the plan in operation will be reviewed periodically.
An examination of the Plan's plan year ended June 30, 1986, was commenced on April 6, 1989. On August 1, 1990, the examination was expanded to include the plan years ended June 30, 1987, June 30, 1988, and June 30, 1989. On April 8, 1993, a final revocation letter was issued to petitioner, determining that the Plan failed to meet the section 401(a) requirements for the plan year ended June 30, 1986, and all subsequent years. The final revocation letter also retroactively revoked the September 18, 1987, favorable determination letter. Prior to filing the petition in this case, petitioner exhausted the administrative remedies within the Internal Revenue Service in accordance with section 7476(b)(3). Petitioner has complied with the requirements of the regulations issued under section 7476(b)(2) with respect to the notice to other interested parties. The Plan's trustees for the plan years at issue were Dr. Jack B. Howard and Robert *617 D. McDougal. Dr. Howard is the sole shareholder of petitioner and was, during all periods at issue, a participant in the Plan. The Plan had six participants during the plan year ended June 30, 1986, eight participants during the plan year ended June 30, 1987, and seven participants during the plan years ended June 30, 1988, and June 30, 1989. The terms of the Plan allowed loans to participants, subject to specific requirements. The applicable provisions under the First Amendment (effective from July 1, 1983, to June 30, 1984) governing such loans were found at paragraph 3.5. The applicable provisions under the Second Amendment (effective from July 1, 1984) governing such loans were found at paragraph 15.16. On July 14, 1983, Dr. Howard borrowed $ 50,000 from the Plan. The record contains no evidence of either a promissory note signed by Dr. Howard documenting the loan or of a security agreement for the loan as required by Plan section 3.5(c) (as then in effect). There is no evidence in the record that Dr. Howard made written application for the loan to the Plan as required by Plan section 3.5(a) (as then in effect). For these reasons, the July 14, 1983, loan to Dr. Howard *618 violated the Plan participant loan provisions. Dr. Howard repaid the July 14, 1983, unsecured loan in four unequal payments, with the last payment occurring on January 17, 1986. Between October 24, 1985, and March 10, 1986, Dr. Howard borrowed an additional $ 26,150 from the Plan. [2] There is no evidence in the record that Dr. Howard signed promissory notes for the loans or gave the Plan any security for the loans, as required by Plan section 15.16(b). There is no evidence in the record that a repayment period of 5 years or less was included in the terms of the loan, as required by Plan section 15.16(a) (for loans made after August 13, 1982). Dr. Howard made the following payments on these later loans: Payment Date
Amount
3/14/86
$ 4,000
12/8/86
$ 7,500
Dr. Howard made no additional payments of principal or interest on these later loans between December 1986 and April 1991. For these reasons, the loans made to Dr. Howard between October 24, 1985, and March 10, 1986, violated the Plan participant loan provisions. *619 For the first time, on January 10, 1992, Dr. Howard executed a promissory note to the Plan covering his liability for the later loans. The promissory note was in the amount of $ 20,335.88 and bore interest at a rate of 10 percent per annum. The promissory note was payable within 5 years and was secured by Dr. Howard's pledge (with spousal consent) of his vested pension benefit. On September 15, 1984, Gary P. Freeland, a plan participant, borrowed $ 10,000 from the Plan. Mr. Freeland signed a promissory note documenting the loan, but did not give the Plan any security for the loan, as required by Plan section 15.16(b). The loan was payable on demand, or no later than October 15, 1990, a repayment period (6 years) that violated the 5-year requirement of Plan section 15.16(a) (for loans made after August 13, 1982). Mr. Freeland made no payments of principal or interest on the $ 10,000 loan from the Plan. For the reasons outlined above, the September 15, 1984, loan to Mr. Freeland violated the Plan participant loan provisions. On March 22, 1985, Delores McDonald, a plan participant, borrowed $ 5,000 from the Plan. Ms. McDonald signed a promissory note documenting the loan, but *620 did not give the Plan any security for the loan, as required by Plan section 15.16(b). The loan was payable on demand or no later than March 22, 1990. Ms. McDonald made regular payments of principal and interest on the $ 5,000 loan from the Plan. The March 22, 1985, loan to Ms. McDonald violated the Plan participant loan provisions (then in effect), since Ms. McDonald failed to provide any security for repayment of the loan. During the period from October 7, 1983, through March 8, 1988, the Plan also made a significant number of loans to individuals who were not plan participants. On October 7, 1983, the Plan loaned $ 35,000 to Lynwood Read. Mr. Read is a friend of Mr. McDougal, one of the Plan trustees, but has no personal or professional relationship with Dr. Howard. Mr. Read signed a promissory note documenting the $ 35,000 loan, but did not give the Plan any security for the loan. The loan was payable in installments through June 30, 1988. Mr. Read made no payments of principal or interest on the $ 35,000 loan. There is no evidence in the record that the Plan took any action to enforce the terms of Mr. Read's installment note. Contrary to the terms of Mr. Read's promissory *621 note, there was an oral agreement between Dr. Howard and Mr. Read that no payments would be due on the note until Mr. Read sold certain Nevada investment property. On June 3, 1985, the Plan loaned $ 5,000 to William H. Lee. Mr. Lee is Dr. Howard's cousin and has been involved with Dr. and Mrs. Howard in numerous financial dealings over the years. Although Mr. Lee claims to have signed a promissory note documenting the $ 5,000 loan, the Plan was unable to supply a copy of the note. The $ 5,000 loan to Mr. Lee was payable on demand and Mr. Lee did not give the Plan any security for the loan. Mr. Lee made no payments of principal or interest on the $ 5,000 loan. On November 27, 1985, the Plan loaned $ 32,500 to I. J. Newlin, Jr. Mr. Newlin is Dr. Howard's uncle and has been involved with Dr. and Mrs. Howard in numerous financial dealings over the years. Although Mr. Newlin claims to have signed a promissory note documenting the $ 32,500 loan, the Plan was unable to supply a copy of the note. The $ 32,500 loan to Mr. Newlin was payable on demand. Mr. Newlin did not give the Plan any security for the loan. Mr. Newlin made no payments of principal or interest on the $ 32,500 *622 loan. Despite Mr. Newlin's failure to make any payments on the foregoing loan, the Plan loaned an additional $ 60,000 to him and his wife on March 8, 1988. Mr. and Mrs. Newlin signed a promissory note documenting the $ 60,000 loan. The $ 60,000 loan to the Newlins was payable on demand and the Newlins did not give the Plan any security for the loan. Petitioner provided the funds for the Newlins' $ 60,000 loan by making a $ 60,000 contribution to the Plan on March 8, 1988. The Plan immediately disbursed the funds on March 8, 1988, to the Newlins. The Newlins made no payments of principal or interest on the $ 60,000 loan. Mr. Newlin is now dead, and the Plan has supplied no supporting documentation showing that claims were filed against Mr. Newlin's estate. On July 20, 1979, the Plan purchased a 2-acre undeveloped tract of real estate in Wagoner County, Oklahoma, from Financial Analysts, Inc. On August 12, 1980, the Plan purchased another one-half acre undeveloped tract of real estate in Wagoner County, Oklahoma, from Financial Analysts, Inc. The deeds to the two properties indicate that the Plan paid an aggregate of $ 23,402 for the properties, but the Plan's books reflected *623 an aggregate cost of $ 18,000 for the properties. The Plan did not obtain warranty deeds for the properties, warranting the transfer of fee simple title to the properties, free and clear of encumbrances. Instead, the Plan obtained only quitclaim deeds conveying whatever right, title, and interest Financial Analysts, Inc., had in the properties. The Plan did not record its interests in either of the two properties under the quitclaim deeds by filing the deeds with the Wagoner County Clerk. There is no evidence in the record that the Plan took any action (by obtaining a title opinion or a title insurance policy) to confirm that it was obtaining fee simple title to the properties, free and clear of encumbrances, or that it received any marketable interest whatsoever. At the time the Plan acquired the Wagoner County properties, there was a preexisting $ 164,000 purchase money mortgage covering the two tracts, as well as adjoining tracts owned by other unrelated parties. Financial Analysts, Inc., executed the mortgage when it acquired the entire 80-acre property, including the Plan's two tracts. In June 1988, the $ 164,000 purchase money mortgage was foreclosed on the entire 80-acre *624 property, including the two tracts owned by the Plan. The mortgage holders obtained the property through the foreclosure and extinguished the rights in the property of all named defendants (including Financial Analysts, Inc.) and all others claiming rights in the property through those defendants. The Plan was not named a party to the foreclosure proceeding, since the quitclaim deeds from Financial Analysts, Inc., had not been filed with the Wagoner County Clerk. However, the Plan's investment in the Wagoner County property became worthless following the foreclosure. As the lawyer for the Plan wrote in a letter to Dr. Howard dated February 6, 1990, "At this point, there does not appear to be any chance of recovering the investment made in the above [referenced] property, and it is my opinion that you should no longer consider it to be an asset of the pension trust." In the late 1970s the Plan acquired three loose diamonds which were valued in 1979 as follows: .57 Carat (VS2-F)
$  1,710
.50 Carat (VS1-F)
$  1,800
2.03 Carat (SI-J)
$ 12,180
The Plan maintained the two small diamonds in a safe deposit box at Citizens Bank & Trust Co., Ada, Oklahoma. In a letter dated *625 July 7, 1989, Dr. Howard told the examiner that the larger diamond was being held at the Financial Analysts, Inc., office for possible sale in the future. In an August 21, 1989, letter, the Plan's counsel told Dr. Howard that neither Financial Analysts, Inc., nor its owner, Frank Goins, could be located. There is no evidence as to when the Plan consigned the large diamond to Financial Analysts, Inc. There is no evidence the Plan took any action to monitor the whereabouts of the large diamond or the marketing efforts of Financial Analysts, Inc. The whereabouts of the large diamond is unknown, and, as the Plan's lawyer wrote in a letter to the IRS dated February 28, 1991, "it appears that * * * [Financial Analysts, Inc.] has embezzled or otherwise converted this Plan asset." There is no evidence in the record that the Plan sought to guard against the loss of the large diamond by insuring it or otherwise protecting its investment. In 1983, the Plan purchased a 16.5-percent interest in the Sandy Creek Partnership I (the partnership), a general partnership in the business of promoting, showing, training and breeding purebred Arabian horses. The partnership's principal place of business *626 is Route 6, Box 328, Ada, Oklahoma 74820. J & L Farms, another entity wholly owned by Dr. and Mrs. Howard, is also located at Route 6, Box 328, Ada, Oklahoma 74820. Dr. and Mrs. Howard owned a 16.5-percent interest in the partnership. Dr. Howard's uncle, I. J. Newlin, and Mr. Newlin's wife owned a 33-percent interest in the partnership. The Plan made the following capital contributions to the partnership between 1983 and 1989: 1983
$ 13,500
1984
$ 13,500
1985
$ 18,000
1986
$  3,500
1987
$  3,559
1988
$  1,500
1989
$   900
Total
$ 54,459
The financial projections provided by the Plan for the partnership forecasted losses in the first 4-5 years, with a large capital gain in the final year of projection. [3] While such a device is typically used to shelter ordinary income from income taxes, no reason was given, and none appears to exist, why trust fund assets believed to be exempt from Federal taxation would be invested in a loss generating partnership. The only reasonable explanation for this Plan investment would appear to be a decision to use the Plan assets as a source of capital for an enterprise otherwise dominated by Dr. and Mrs. Howard and Mr. and Mrs. *627 Newlin. The only operating assets owned by the partnership were a number of horses purchased in 1983 for $ 60,000. The Plan received no distributions, in cash or in kind, from the partnership from 1986 through 1989, and there is no evidence the Plan received any distributions at any time prior to 1986. There is no evidence the partnership generated any gross income at any time. The partnership consistently had a negative cash flow from operations since its commencement in 1983. On *628 August 29, 1986, the Plan disbursed $ 1,500 to Betsy Jackson, who was not a plan participant. The Plan provided no explanation for this payment, and there is no evidence the $ 1,500 was repaid to the Plan. On August 30, 1986, and October 1, 1986, the Plan disbursed $ 8,000 and $ 4,000, respectively, to J & L Farms, an entity owned by Dr. and Mrs. Howard. [4] The Plan provided no explanation for these payments, and there is no evidence the $ 12,000 was repaid to the Plan. The Commissioner determined that the administration of the Plan violated the exclusive benefit rule of section 401(a). Following that determination the qualified status of the Plan was revoked as to the plan year ending June 30, 1986, and all years thereafter. Section 401(a) provides in part: (a) REQUIREMENTS FOR QUALIFICATION. -- A trust created or organized in the United States and forming part of a stock bonus, *629 pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section -- * * * (2) if under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be (within the taxable year or thereafter) used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries * * *
Section 1.401-1(b)(3), Income Tax Regs., states: All of the surrounding and attendant circumstances and the details of the plan will be indicative of whether it is a bona fide stock bonus, pension, or profit-sharing plan for the exclusive benefit of employees in general. The law is concerned not only with the form of a plan but also with its effects in operation. * * *
See also Winger's Dept. Store, Inc. v. Commissioner, 82 T.C. 869, 876 (1984); Quality Brands, Inc. v. Commissioner, 67 T.C. 167, 174 (1976). In the present case there is no question that *630 the Plan's documents were in proper form, the question is whether the operation of the Plan was such that the exclusive benefit rule of section 401(a) was violated. We must decide whether the investment practices of the Plan were so antithetical to the Plan purpose as to violate the exclusive benefit rule. The Internal Revenue Code and the income tax regulations do not specifically describe what types of investments will meet the exclusive benefit rule. Section 1.401-1(b)(5)(i), Income Tax Regs., states in part: No specific limitations are provided in section 401(a) with respect to investments which may be made by the trustees of a trust qualifying under section 401(a). Generally, the contributions may be used by the trustees to purchase any investments permitted by the trust agreement to the extent allowed by local law. * * *
However, Rev. Rul. 69-494, 1969-2 C.B. 88, sets forth four criteria in respect of employer security investments for compliance with the statute. These are (1) the cost must not exceed fair market value at the time of purchase; (2) a fair return commensurate with the prevailing rate must be provided; (3) *631 sufficient liquidity must be maintained to permit distributions in accordance with the terms of the plan; and (4) the safeguards and diversity that a prudent investor would adhere to must be present. The reasoning of Rev. Rul. 69-494 has been extended to investments not involving employer securities. See Rev. Rul. 73-532, 1973-2 C.B. 128. Although this Court has held that these conditions are not necessarily binding, Winger's Dept. Store, Inc. v. Commissioner, supra at 882; Shelby U.S. Distribs. v. Commissioner, 71 T.C. 874, 882 (1979), they are nevertheless persuasive guidelines as to the congressionally intended requirements. Cf. Central Motor Co. v. United States, 583 F.2d 470, 490 (10th Cir. 1978), revg. in part and affg. on this issue 454 F. Supp. 54 (D. N.M. 1976). Prior decisions dealing with the exclusive benefit rule and plan disqualification were discussed in Winger's Dept. Store, Inc. v. Commissioner, supra.No bright line test *632 was stated in Winger's or the other cases where exclusive benefit rule violations were found, Central Motor Co. v. United States, supra, Ma-Tran Corp. v. Commissioner, 70 T.C. 158 (1978), Feroleto Steel Co. v. Commissioner, 69 T.C. 97 (1977). It is clear that each case must be decided on its own facts. In Winger's Dept. Store, Inc. v. Commissioner, supra at 887, the decision was "based on a totality of the transgressions". See also Feroleto Steel Co. v. Commissioner, supra at 113 ("In these circumstances, we hold that the exclusive benefit rule has not been followed."). Our examination of the facts of this case leaves no doubt that the Plan was not managed for the exclusive benefit of the employees. While the detailed facts of this case are not identical with those in Winger's, the ultimate thrust of Winger's is equally applicable here. The plans in both cases were not managed for the exclusive benefit of the employees, in violation of section 401(a). All of the investments described above showed an *633 indifference towards the continued well-being of the plan participants. The Plan was needlessly subjected to an increased risk of loss because of the poor way that its assets were managed. The Plan made substantial unsecured loans both to plan participants and to non-participants. Each of the participant loans violated the terms of the Plan in effect at the time of the loan transaction. The fact that all of the loans were unsecured is significant. We note that in Winger's Dept. Store, Inc. v. Commissioner, supra at 882-883, and Central Motor Co. v. United States, supra at 491, the lack of adequate security for the loans made was noted as evidence of exclusive benefit rule violations, while in Shelby U.S. Distribs. v. Commissioner, supra at 884, the fact that the loans were secured was noted as evidence against an exclusive benefit rule violation. In our opinion, the lending of a large portion [5] of the Plan's assets through unsecured loans, the making of participant loans in violation of the terms of the Plan, the failure to pursue delinquent payments owed the Plan, and the *634 oral agreement between Dr. Howard and Mr. Read combine to prove the Plan was not managed for the exclusive benefit of the employees, but for the equal or greater benefit of those who borrowed from the Plan. The Plan was used as a personal bank by Dr. Howard, his family, and selected others, for loans that were made without regard to risk or in at least one case prior repayment history. These facts alone would support the Commissioner's disqualification of the Plan. These do not, however, represent the full extent of the Plan's violations. *635 The Plan's investment in the Wagoner County land, the management of the large diamond, and the investment in the partnership further support our finding as to violations of the exclusive benefit rule. The Plan purchased quitclaim deeds without investigating the state of the title in the land or obtaining title insurance. The use of Plan assets for such an investment is so far removed from any reasonable standard of management that the trustees should have known that they were putting the Plan's assets at risk. Subsequent events only proved what should have been clear from the beginning; these misguided land purchases conferred a benefit on the seller at the expense of the Plan participants. The large diamond was entrusted to Financial Analysts, Inc., for possible sale. By turning a physical asset over to a third party and then failing to monitor that asset or protect its value through insurance or any other means, the Plan needlessly subjected itself to an unnecessary risk of loss. This is but another example of how the Plan was not managed for the exclusive benefit of the employees, but was managed in a way that substantial benefits were sure to accrue outside of the Plan. *636 [6]
The Plan investment in the partnership is, perhaps, the most troubling of the exclusive benefit rule violations. As noted above, the financial projections included in the record [7] forecasted a series of losses before significant capital gains were to be realized through the sale of horses. In our opinion, the investment of qualified plan assets in such a tax shelter is clearly improper. We agree with the Commissioner's assertion that the Plan investment in the partnership served only as a source of capital to an enterprise otherwise controlled by Dr. Howard, Mr. Newlin, and their respective spouses. Such a use of funds to benefit a Plan participant who is also a trustee and the sole shareholder of the Plan sponsor is a clear violation of the exclusive benefit rule. *637 The Commissioner's examination discovered three other transactions which violated the exclusive benefit rule. These were the August 29, 1986, payment to Betsy Jackson and the payments on August 30 and October 1, 1986, to J & L Farms. There is no evidence that these payments were loans or that the amounts have been repaid. We hardly need to pause to state that unexplained payments to third parties (one of which is controlled by a Plan trustee who is the sole shareholder of the Plan sponsor) violate the Code's mandate that the Plan's funds be used for the exclusive benefit of the employees. Having described the way in which the Plan assets were managed and how the benefits of the Plan's investments could have, or did, accrue to those outside the Plan, we are convinced the exclusive benefit rule of section 401(a) was violated. We are also convinced that the extent of those violations supports the Commissioner's determination that the Plan's qualified status should be revoked. The petitioner makes several arguments against such determination, with which we deal below. Petitioner first argues that the loans made to Dr. Howard between October 24, 1985, and March 10, 1986, and the *638 two disbursements to J & L Farms should not be aggregated with the other transactions described above in order to find the exclusive benefit rule was violated. Petitioner's reasoning is that these transactions were determined to be prohibited transactions under section 4975, and are adequately dealt with through the applicable excise taxes. We disagree. This same argument was made to and rejected by this Court in Winger's Dept. Store, Inc. v. Commissioner, 82 T.C. at 887: Nor do we believe that the excise tax sanction in section 4975 was intended to preempt the sanction of disqualification under the exclusive benefit rule in the case now before us. We are not herein dealing with any isolated prohibited transaction described in section 4975. Rather, our decision that petitioner's trust did not operate for the exclusive benefit of employees is based on a totality of the transgressions that occurred and pervaded the entire operations of the trust. The fact that some of those transgressions are described specifically in section 4975 and made subject to an excise tax is merely fortuitous. [Fn. ref. omitted.]
Petitioner quoted this language *639 in its opening brief, but offered no reason why our treatment of the prohibited transactions in the present case should differ from the treatment given in Winger's. Petitioner argues that the prohibited transactions in the present case were not as pervasive as those found in Winger's. However, this record here does reveal numerous prohibited transactions that constituted violations of the exclusive benefit rule. It is not a matter of critical importance as to which case had a greater number of such violations. The point is that there were a significant number of such violations in both cases. Petitioner next argues that the Plan's non-loan investments (the land purchases, the loose diamonds, and the partnership) do not violate the exclusive benefit rule. Petitioner contends that a finding that these investments were exclusive benefit rule violations is based upon an improper use of hindsight. It relies upon DeBruyne v. Equitable Life Assurance Society of the United States, 720 F. Supp. 1342 (N.D. Ill. 1989), affd. 920 F.2d 457 (7th Cir. 1990), where plan trustees were found not to have violated the fiduciary *640 duties established by the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, 88 Stat. 829, by failing to anticipate the stock market crash of 1987. Petitioner fails to grasp the Commissioner's argument and, in turn, the basis for the conclusion that we reach today. The exclusive benefit rule was violated not because of the ultimate results of the non-loan investments. The exclusive benefit rule was violated either upon making the investments or upon their mismanagement. The exclusive benefit rule was violated the moment the Plan purchased the land investments without investigating the titles or obtaining title insurance. The Plan undoubtedly paid more for a quitclaim deed than it would have paid had it known of the pre-existing mortgage. Similarly, the exclusive benefit rule was violated when the Plan invested in the partnership in order to provide capital for Dr. Howard and Mr. Newlin. It is irrelevant for purposes of this determination what the outcomes of those investments were. With respect to the loose diamond, the exclusive benefit rule was violated because of the poor way that asset was supervised, apart from any other possible grounds for finding *641 a violation. Petitioner's reliance on DeBruyne v. Equitable Life Assurance Society of the United States, supra, is misplaced. There the Court was asked to look at the results of otherwise reasonable investments. Here we need not even look at the results of the investments at issue, since it is sufficient to examine the wisdom of making the investments at all. Petitioner's third argument is that the Plan's investments, viewed in their totality, do not merit disqualification. Petitioner argues that the extent of the violations in the present case does not reach the level of violations found in Central Motor Co. v. United States, 583 F.2d 470 (10th Cir. 1978), Feroleto Steel Co. v. Commissioner, 69 T.C. 97 (1977), Ma-Tran Corp. v. Commissioner, 70 T.C. 158 (1978), and Winger's Dept. Store, Inc. v. Commissioner, 82 T.C. 869 (1984). We disagree. Our review of the record in this case makes it clear to us that the Plan's assets were managed first for the benefit of Dr. Howard, his family, and certain others, rather than for *642 the benefit of the Plan participants as a whole. The argument can also be made that certain Plan assets, the land investments and the large loose diamond, were so mismanaged that they benefited no one. This means only that they were not managed for the benefit of the employees. We refuse to engage in the numbers game the petitioner and the Commissioner invite us to play regarding the percentage of the Plan assets involved in exclusive benefit rule violations. Part of our reason for doing so is the difficulty, mentioned above at note 5, of establishing the amount of the Plan's total (remaining) investments. Without determining an actual percentage, it is clear to us that a majority of the Plan's assets were invested in ways that violated the exclusive benefit rule. Also, and perhaps more important, our decision is based on a determination that the entire investment philosophy of the Plan was aimed not at providing benefits for the employees, but at making capital available to Dr. Howard and his relatives, and certain others. The manipulation of pension plan assets by a trustee, who is also the sole shareholder of the plan sponsor, is a clear example of an exclusive benefit rule *643 violation. Finally, petitioner has advanced several arguments relating to the steps taken by the Commissioner in revoking the qualified status of the Plan. First, in its reply brief petitioner has raised an entirely new issue based upon its allegation in the reply brief that the record "is void of any fact showing that the Secretary of the Treasury timely notified the Secretary of Labor prior to issuing, to Petitioner, a preliminary notice of intent to disqualify" the Plan as required by section 103 of the Reorganization Plan No. 4 of 1978, 43 Fed. Reg. 47113, 1979-1 C.B. 480. The Commissioner moved to strike the portions of petitioner's reply brief relating to this new issue, pointing out that this new issue involved factual materials not contained in the stipulated administrative record and that five separate exhibits attached to the motion provided evidence that there was in fact consultation between the IRS and the Department of Labor, sufficient to satisfy the requirements of section 103 of the Reorganization Plan No. 4 of 1978. We granted the motion to strike, and accordingly do not regard this new issue as properly before us. Indeed, *644 in its response to the motion to strike petitioner indicated that it had no objection to striking those portions of its reply brief "addressing the three 'new' legal issues" relating to the "coordination aspects of Section 103 of the Reorganization Plan". However, it continues to argue certain other matters regarding the steps taken by the Commissioner in disqualifying the Plan. First, petitioner contends that the IRS exceeded its authority either by applying Rev. Rul. 69-494, 1969-2 C.B. 88, as if it had the force of law or by disqualifying the Plan for violations of ERISA section 404, something that, petitioner alleges, the Commissioner cannot do. Section 404(a)(1)(B) of ERISA requires a plan fiduciary to discharge his duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims". 88 Stat. 877. The Commissioner's interpretation of section 401(a)(2) in Rev. Rul. 69-494 dictates that investments be made *645 using the safeguards "a prudent investor would adhere to". 1969-2 C.B. 88. The overlap between the requirements of the Internal Revenue Code (as interpreted by the Commissioner) and ERISA are obvious. This overlap was explicitly recognized by Congress when it enacted ERISA. As the conference committee report accompanying ERISA stated: Under the Internal Revenue Code, qualified retirement plans must be for the exclusive benefit of the employees and their beneficiaries. Following this requirement, the Internal Revenue Service has developed general rules that govern the investment of plan assets, including a requirement that cost must not exceed fair market value at the time of purchase, there must be a fair return commensurate with the prevailing rate, sufficient liquidity must be maintained to permit distributions, and the safeguards and diversity that a prudent investor would adhere to must be present. The conferees intend that to the extent that a fiduciary meets the prudent man rule of the labor provisions, he will be deemed to meet these aspects of the exclusive benefit requirements under the Internal Revenue Code.
H. Conf. *646 Rept. 93-1280, at 302 (1974), 1974-3 C.B. 415, 463. It is clear that a violation of the prudent investor standard of ERISA can simultaneously act as a violation of the exclusive benefit rule of the Code. Contrary to the position taken in petitioner's reply brief, the Commissioner did not disqualify the Plan for violating the prudent investor requirement of ERISA section 404(a)(1)(B). The Commissioner disqualified the Plan for violations of the exclusive benefit rule of section 401(a). To do so the Commissioner was required to determine what it means to use trust funds for the exclusive benefit of the employees as required by section 401(a)(2). As noted above, the Commissioner has already offered an interpretation of the exclusive benefit rule in Rev. Rul. 69-494. While we have not conferred upon Rev. Rul. 69-494 the force of law, Shelby U.S. Distribs., Inc. v. Commissioner, 71 T.C. at 882; Winger's Dept. Store, Inc. v. Commissioner, 82 T.C. at 882, we do regard it as setting forth relevant standards to be *647 considered, and we note the Tenth Circuit's conclusion that the ruling is of some evidentiary value in interpreting the statute. Central Motor v. United States, 583 F.2d at 490. Therefore, while our decision could be seen as applying a requirement of prudence, we have not taken these admittedly imprudent transactions [8] as conclusively determinative of the issue. We view them merely as evidence of the fact that the Plan was not managed for the exclusive benefit of the employees. In Shelby U.S. Distribs., Inc. v. Commissioner, supra at 884, in deciding that Rev. Rul. 69-494 had *648 not acquired the force of law, it was stated "In Feroleto and Central Motor, the trusts lost their exemption because of their investment practices, but in each case, the conclusion is justifiable without subjecting the trust to a rule of prudence". However, in distinguishing Central Motor, the Shelby court went on to say "In Central Motor, although the district court referred to a rule of prudence and a requirement of diversification, the loan was unwise and improper, irrespective of such requirements". Id.
Similarly, in Winger's Dept. Store, Inc., supra, after determining that Rev. Rul. 69-494 did not acquire the force of law following the passage of ERISA, we upheld the Commissioner's disqualification of the plan at issue. We noted several factors in upholding the disqualification; among those factors were the failure of the participant loans to follow the plan prescriptions, the risk created by investing a major portion of the trust assets in unsecured loans to one individual, and the fact that the remaining trust assets were not profitably invested. Winger's Dept. Store, Inc. v. Commissioner, supra at 882-883. *649 The cases above show that disqualification is proper where the investments were "unwise and improper" or risky and unprofitable. Without stating so, these cases looked at the prudence of the plan investments for evidence of exclusive benefit rule violations. That evidence was sufficient to support disqualification without granting conclusive legal status to Rev. Rul. 69-494. While violations of the prudent investor requirement of Rev. Rul. 69-494 will not lead to automatic disqualification, such violations may properly be considered as evidence of exclusive benefit rule violations. Petitioner argues that we should not consider the prudence of the Plan's investments at all. Petitioner states: The test is to determine whether the trust's investment policies effectively make the plan serve the employer's interests or selected employees' interests to the point where the plan is no longer operated according to the exclusive benefit rule. The relevant inquiry is, therefore, unconcerned with policies or practices which, though imprudent, do not serve the interests of either the employer *650 or selected employees. [Fn. ref. omitted.]
[Pet. Reply Brief at p.6.] Petitioner relies upon a passage from Winger's Dept. Store, Inc. v. Commissioner, supra at 878, where it was stated: Notwithstanding the statutory and regulatory failure to deal specifically with the application of the exclusive benefit rule in the context of trust investments, it is obvious that an investment policy, if not otherwise checked, effectively could make the plan serve the employer's interests or selected employees' interests to the point where the plan is no longer operated in accordance with the exclusive benefit rule embodied in section 401(a). * * *
We reject petitioner's proposed standard. We find it is inconsistent with the cases described above, where we refused to treat the Commissioner's rule of prudence as conclusive, but where we considered the prudence of the plan investments in determining whether the exclusive benefit rule was violated. We find petitioner's interpretation of the above quoted passage to be unduly narrow. While using plan assets to benefit either the employer or selected employees would serve as evidence of an exclusive *651 benefit rule violation, we think that Winger's did not intend to set forth an exclusive standard for judging violations. Having concluded that it is proper to consider the evidence of the imprudent investments made by the Plan, we are convinced that the primary purpose of benefiting employees or their beneficiaries was not maintained with respect to the Plan's investments. See Winger's Dept. Store, Inc. v. Commissioner, supra at 880; Feroleto Steel Co. v. Commissioner, 69 T.C. at 107. The investments made by the Plan violated the exclusive benefit rule of section 401(a). The Commissioner properly revoked the qualified status of the Plan. Decision will be entered for respondent. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. These loans were determined by the Key District Office to be prohibited transactions within the meaning of sec. 4975(c).↩
3. The projections made part of the record were for Sandy Creek General Partnership II, while the Plan invested in Sandy Creek Partnership I. No explanation for this discrepancy was given, and there is no suggestion that the projections for the other partnership would be materially different. In a letter dated Dec. 9, 1989, the Commissioner's agent requested that the petitioner provide an executed copy of the Sandy Creek General Partnership - I partnership agreement. There is no evidence the petitioner complied with this request.↩
4. These disbursements were determined by the Key District Office to be prohibited transactions within the meaning of sec. 4975(c).↩
5. The exact percentage of Plan assets loaned to individuals is difficult, if not impossible, to calculate. This is because, as already discussed, specific Plan assets appear to be lost forever (the large diamond and the land investment). Also, the value of the partnership investment would appear to be significantly less than the carrying value included on the Plan's final balance sheet. If these investments were removed from the Plan's balance sheet (as we believe they should be), then the amount of total assets will decrease, and the percentage of total assets represented by these loans will increase.↩
6. We do not mean to imply that the mere theft or embezzlement of a plan asset, without more, constitutes a violation of the exclusive benefit rule requirement.↩
7. See supra↩ note 3.
8. Petitioner admitted the unsecured loans made to Plan participants and to third parties failed to meet the standard of prudence contained in Rev. Rul. 69-494, 1969-2 C.B. 88↩, and Employee Retirement Income Security Act of 1974, Pub. L. 93-406, 88 Stat. 877-878. [Petitioner's brief at p.20.]