T.C. Memo. 1999-369


UNITED STATES TAX COURT


WESTCHESTER PLASTIC SURGICAL ASSOCIATES, P.C., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 13073-97R.                    Filed November 5, 1999.


<u>Andrew I. Panken</u> and <u>Robert A. DeVellis</u>, for petitioner.

<u>Mark L. Hulse</u> and <u>Catherine R. Chastanet</u>, for respondent.


MEMORANDUM OPINION


HAMBLEN, <u>Judge</u>:  This is an action for a declaratory
judgment regarding the qualification of petitioner's defined
benefit plan and trust.  This case was submitted on the
administrative record, pursuant to Rule 217.  Unless otherwise
indicated, all section references are to the Internal Revenue

Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.

On April 3, 1997, respondent issued a final nonqualification letter to petitioner stating that the Westchester Plastic Surgical Associates Defined Benefit Plan (the Defined Benefit Plan) failed to meet the requirements of section 401(a) for the plan years ending October 31, 1990, and thereafter, and that its related trust (the Trust) was not tax exempt under section 501(a) for trust years ending with or within the affected plan years. Respondent also revoked the prior favorable determination letter to petitioner dated December 5, 1988.

The issue for decision is whether petitioner's Defined Benefit Plan violated the exclusive benefit rule under section 401(a)(2).[1]

---

[1]Petitioner also has a Money Purchase Pension Plan which it adopted effective as of Jan. 15, 1972. We note that throughout both petitioner's and respondent's briefs, both petitioner and respondent refer to the Defined Benefit Plan and the Money Purchase Plan as if they were one plan. However, we note that there are two separate plans: The Defined Benefit Plan and the Money Purchase Pension Plan. See Morrissey v. Commissioner, T.C. Memo. 1998-443. Since the petition addresses only the Defined Benefit Plan and attaches only the Nonqualification Letter for the Defined Benefit Plan and since the administrative record contains only the Nonqualification Letter for the Defined Benefit Plan, we will address only the qualification of the Defined Benefit Plan.

## Background

Petitioner was a corporation existing under the laws of the State of New York. At the time of the filing of its petition in this case, petitioner's address was P.O. Box 852, Southampton, New York. Michael Morrissey (Morrissey) was the owner of all of the outstanding shares of petitioner's stock from 1972 through the years in issue. Morrissey was also the president and secretary of petitioner from inception.

Petitioner adopted the Defined Benefit Plan effective as of November 1, 1976. The Defined Benefit Plan received a favorable determination letter from the Internal Revenue Service dated December 5, 1988. Since its inception, Morrissey has always been the sole trustee of the Trust and as such has exercised complete control over the management and disposition of the Defined Benefit Plan assets.

The Defined Benefit Plan ceased benefit accruals in 1990, at which time all plan participants were 100 percent vested. The Defined Benefit Plan terminated pursuant to a resolution of petitioner's board of directors dated September 4, 1990, and effective September 26, 1990. When the Defined Benefit Plan ceased benefit accruals and terminated in 1990, there were two participants in addition to Morrissey. These two participants were paid their full benefits in 1990 when the Defined Benefit Plan terminated. With the payout to these two participants in

1990, Morrissey became the sole remaining participant of the Defined Benefit Plan.

Under the Agreement for the Trust,[2] dated October 25, 1977, effective November 1, 1976, section 7.01(o) provides that the trustees shall have the power with respect to the Trust:

> To lend money to a Participant at the then current rates of interest being charged by commercial banks for similar loans, in an amount not exceeding the value of such Participant's Accrued Benefit and all such loans to the extent they are secured only by the Participant's vested Accrued Benefit shall be repaid within two (2) years from the date of such loan.  Any loans made pursuant to this subparagraph to the extent they are not secured by the Participant's vested Accrued Benefit shall be otherwise adequately secured.

Under the second amendment, effective November 1, 1976, section 7.01(o) was amended to read as follows:

> To lend money to a Participant at the then current rates of interest being charged by commercial banks for similar loans, in an amount not exceeding the value of such Participant's Accrued Benefit, and all such loans to the extent they are secured only by the Participant's vested Accrued Benefit shall be repaid within seven (7) years from the date of such loan.  Any loans made pursuant to this subparagraph to the extent they are not secured by the Participant's vested Accrued Benefit shall be otherwise adequately secured.

From February 8, 1984, through December 9, 1988, Morrissey, as trustee of the Defined Benefit Plan, made a series of six

---

[2]We note that the administrative record contains an Agreement only for the Trust and not for the Defined Benefit Plan itself.  According to this Agreement, "this Trust * * * forms part of a Pension Plan of the Employer".  Consequently, we find the Defined Benefit Plan incorporates the Trust.

loans to himself: On February 8, 1984, Morrissey as trustee of the Defined Benefit Plan executed an installment note whereby the Defined Benefit Plan lent $13,000 of plan assets to Morrissey at a rate of interest of 11 percent. On August 27, 1985, Morrissey as trustee of the Defined Benefit Plan executed an installment note whereby the Defined Benefit Plan lent $50,000 of plan assets to Morrissey at a rate of interest of 12 percent. On December 3, 1985, Morrissey as trustee of the Defined Benefit Plan executed an installment note whereby the Defined Benefit Plan lent $5,500 of plan assets to Morrissey at a rate of interest of 10 percent. On January 3, 1986, Morrissey as trustee of the Defined Benefit Plan executed an installment note whereby the Defined Benefit Plan lent $14,500 of the plan assets to Morrissey at a rate of interest of 10.5 percent. On February 12, 1988, Morrissey as trustee of the Defined Benefit Plan executed an installment note whereby the Defined Benefit Plan lent $20,000 of plan assets to Morrissey at a rate of interest of 9.75 percent. On December 9, 1988, Morrissey as trustee of the Defined Benefit Plan executed an installment note whereby the Defined Benefit Plan lent $2,000 of plan assets to Morrissey at a rate of interest of 11.5 percent.

According to the administrative record provided in this case the six loans and their interest rates were as follows:

| Date of Loan | Obligee | Loan Amount | Interest Rate |
|---|---|---|---|
| 2/8/84 | Defined Benefit Plan | $13,000 | 11% |
| 8/27/85 | Defined Benefit Plan | 50,000 | 12 |
| 12/3/85 | Defined Benefit Plan | 5,500 | 10 |
| 1/3/86 | Defined Benefit Plan | 14,500 | 10.5 |
| 2/12/88 | Defined Benefit Plan | 20,000 | 9.75 |
| 12/9/88 | Defined Benefit Plan | 2,000 | 11.5 |
| Total | | 105,000 | |

These six notes all fail to state when payments are due or when repayments should be made.  None of the six installment notes require Morrissey to provide security or collateral for the loans.  None of the installment notes state a maturity date.

The administrative record provided in this case contains no evidence that Morrissey made any repayments on any of the six loans from the Defined Benefit Plan, and we so find.  In Morrissey v. Commissioner, T.C. Memo. 1998-443, we found that on October 19, 1990, Morrissey transferred to the Money Purchase Plan his 50-percent interest in two parcels of unencumbered real estate sited in Southampton, New York.  We stated:  "The record does not show that * * * [Morrissey] ever transferred any asset to the * * * [Defined Benefit Plan] in repayment of moneys that he borrowed from it."  We also stated:  "Indeed, it appears that * * * [Morrissey] continues to owe the * * * [Defined Benefit Plan] the money (with interest) that it lent to him because he

has never transferred any value to the * * * [Defined Benefit Plan] to repay these amounts."

Morrissey signed a form titled "Employee's Waiver of Portion of Benefit Not Funded Upon Distribution of Plan's Assets Pursuant to Plan Termination Effective:  September 26, 1990," in which he waived his right to any unfunded benefits, to the extent that the Defined Benefit Plan assets were insufficient to provide the actuarial equivalent of his normal retirement benefit on the date of benefit distributions.  This form states, in pertinent part:

> I.  The undersigned, a Participant in the captioned Plan, hereby agrees that, to the extent Plan assets as of the date of benefit distributions are insufficient to provide (on a lump sum basis) the actuarial equivalent of said Participant's normal retirement benefit entitlement, the said Participant waives his right to any portion of said benefit not funded as of such date.

For the plan year ending October 31, 1989, the Form 5500[3] for the Defined Benefit Plan reports total plan assets as of the beginning of the plan year of $179,296 and $191,680 at the end of the plan year.  In addition, the Form 5500 reports $129,031 as "any loan or extension of credit by the plan to the employer, any fiduciary, any of the five most highly paid employees of the employer, any owner of a 10% or more interest in the employer, or relatives of any such persons."  Furthermore, the Form 5500

---

[3]The Form 5500 is the Annual Return/Report that must be completed for Employee Benefit Plans.

reports that the employer owes $231,796 in contributions to the plan which are more than 3 months overdue.

The Schedule B[4] of Form 5500 for the Defined Benefit Plan for the plan year ended October 31, 1989, reports the current value of the assets accumulated in the Defined Benefit Plan as of the beginning of the plan year as $368,279, which includes a prior year funding deficiency of $188,983.[5]  In addition, the Schedule B reports the total present value of vested benefits as of the end of the plan year for participants as $335,384. Furthermore, the amount of contribution certified by the actuary as necessary to reduce the funding deficiency to zero is $231,796.[6]

---

[4]The Schedule B contains Actuarial Information for the Employee Benefit Plan and is attached to the Form 5500.

[5]$368,279 - $188,983 = $179,296.

[6]Funding standard account statement for plan year ending Oct. 31, 1989:

| Charges to funding standard account: | |
|---|---|
| Prior year funding deficiency | $188,983 |
| Employer's normal cost for plan year as of 11/1/88 | 25,643 |
| Interest | 17,170 |
| Total charges | 231,796 |
| Credits to funding standard account: | -0- |
| Funding deficiency | 231,796 |

The Form 5500 for the Defined Benefit Plan for the plan year ended October 31, 1990, reports that the Defined Benefit Plan was terminated during this plan year, that a termination resolution was adopted this plan year, and that no trust assets reverted to the employer.  It further reports that there was $257,639 of contributions that was more than 3 months due.  In addition, it reports the following information:

| Assets | Beginning of year | End of year |
|---|---|---|
| Cash | $646 | $2,295 |
| Receivables | 38,922 | 40,063 |
| Investments | | |
|   Real estate and mortgages | -0- | 137,270 |
|   Loans to participants: | | |
|     Mortgages | -0- | -0- |
|     Other | 152,112 | -0- |
|   Total investments | 152,112 | 137,270 |
| Total assets | 191,680 | 179,628 |
| Liabilities | | |
| Total liabilities | -0- | -0- |
| Net assets | 191,680 | 179,628 |

The Form 5500 also reports expenses of $20,653 which represented distribution of benefits directly to participants.

The Schedule B for the year ended October 31, 1990, reports $423,476[7] as the current value of assets accumulated as of the beginning of the year.  It reports $341,583 in total vested benefits, $9,900 to one terminated participant, and $331,683 to

---

[7]This $423,476 includes the prior year funding deficiency of $231,796.  $423,476 - $231,796 = $191,680.

two active participants.  It further reports no contributions made to the Defined Benefit Plan by the employer.  In addition, the Schedule B reports $257,639[8] as the contribution necessary to reduce the funding deficiency.

The Form 5500 for the Defined Benefit Plan for the plan year ended October 31, 1991, reports total plan assets of $179,628 at the beginning of the plan year and $171,003 in plan assets at the end of the plan year.  It further reports plan income of -$8,625. In addition, it reports that the plan at any time held 20 percent or more of its assets in any single security, debt, mortgage, parcel of real estate, or partnership/joint venture interests and that the dollar amount was $124,021.

The activity in petitioner's Defined Benefit Plan Trust account at the Bank of New York for account No. 015-268675 was as follows:

---

[8]Funding standard account statement for plan year ending Oct. 31, 1990:

| Charges to funding standard account: | |
|---|---|
| Prior year funding deficiency | $231,796 |
| Employer's normal cost | 554 |
| Interest | 18,588 |
| Addtl. interest due to late contributions | 6,701 |
| Total charges | 257,639 |
| Credits to funding standard account | -0- |
| Funding deficiency | 257,639 |

| Date | Withdrawal | Deposit | Balance |
|------|-----------|---------|---------|
| 8/27/85 | $1,333.20 | --- | $53,352.07 |
| 8/27/85 | 50,000.00 | --- | 3,352.07 |
| 10/15/85 | --- | $1,127.20 | 4,479.27 |
| 11/25/85 | --- | 1,333.20 | 5,812.47 |
| 12/03/85 | 5,500.00 | 673.91 | 986.38 |
| 1/13/86 | 14,500.00 | 13,654.49 | 140.87 |
| 4/14/86 | --- | 1,059.80 | 1,200.67 |
| 10/07/86 | 3.00 | 1,028.36 | 2,226.03 |
| 1/14/87 | --- | 20,903.40 | 23,129.43 |
| 2/12/88 | 20,000.00 | 1,146.72 | 4,276.15 |
| 12/9/88 | 2,000.00 | 282.64 | 2,558.79 |
| [1] | 2,000.00 | --- | 558.79 |

[1]We are unable to decipher this date from the record, and it is immaterial to the outcome of this case.

The activity in petitioner's Defined Benefit Plan Trust account at the Bank of New York for account No. 015-283294 was as follows:

| Date | Withdrawal | Deposit | Balance |
|------|-----------|---------|---------|
| 7/31/90 | | $671.18 | $671.18 |
| 8/16/90 | | 1,600.00 | 2,271.18 |
| 4/04/91 | | 74.20 | 2,345.38 |

## Discussion

This Court may exercise jurisdiction over a declaratory judgment action if there is an actual controversy involving a determination by the Secretary with respect to the initial or continuing qualification of a retirement plan. See sec. 7476(a); Loftus v. Commissioner, 90 T.C. 845, 855 (1988), affd. without published opinion 872 F.2d 1021 (2d Cir. 1989).

Petitioner contends that the Defined Benefit Plan did not violate the exclusive benefit rule and therefore should remain qualified. Respondent contends that the Defined Benefit Plan is not a qualified plan within the meaning of section 401(a) for plan year ended October 31, 1990, and thereafter because its investments and Morrissey's transfer of real property, on October 19, 1990, in an attempt to repay loans to him, violated the exclusive benefit requirement. Specifically, respondent contends that the Defined Benefit Plan failed to satisfy the exclusive benefit rule by investing almost all of its assets in 23 loans to the plan trustee.[9]

Section 404(a)(1)(A) provides that contributions to a pension trust are deductible by the employer if the trust is exempt from tax under section 501(a). In order for the trust to be entitled to tax-exempt status under section 501(a), a retirement plan must be established by an employer and meet all the requirements of section 401(a). See Professional & Executive

---

[9]Respondent seems to think that the Defined Benefit Plan and the Money Purchase Plan are one plan, as it appears respondent has combined the loans from both plans. See supra note 1. We previously found that from Nov. 14, 1979, to Feb. 17, 1989, the Defined Benefit Plan and Money Purchase Plan made 23 loans to Morrissey. See Morrissey v. Commissioner, T.C. Memo. 1998-443. In addition, we previously found that Morrissey transferred to the Money Purchase Plan his 50-percent interest in two parcels of unencumbered real estate and that he never transferred any value to the Defined Benefit Plan to repay his loans from the Defined Benefit Plan assets. See id.

Leasing, Inc. v. Commissioner, 89 T.C. 225, 230 (1987), affd. 862 F.2d 751 (9th Cir. 1988). In determining whether a plan is qualified under section 401(a), the operation of the trust is relevant as are its terms. See Winger's Depart. Store, Inc. v. Commissioner, 82 T.C. 869, 876 (1984); Quality Brands, Inc. v. Commissioner, 67 T.C. 167, 174 (1976); see also sec. 1.401-1(b)(3), Income Tax Regs.

Section 401(a)(2)[10] provides that for a trust forming part of an employer's pension plan to be exempt, it must be impossible, at any time before the satisfaction of all liabilities with respect to the employer's employees and their beneficiaries under the trust, for any part of the corpus or income to be used for, or diverted to, purposes other than for the exclusive benefit of those employees or beneficiaries.

---

[10]Sec. 401(a) provides, in pertinent part, as follows:

SEC. 401(a). Requirements for Qualification.--A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section--

* * * * * * *

(2) if under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be * * * used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries * * *

"[T]he phrase 'purposes other than for the exclusive benefit of his employees or their beneficiaries' includes all objects or aims not solely designed for the proper satisfaction of all liabilities to employees or their beneficiaries covered by the trust."  Sec. 1.401-2(a)(3), Income Tax Regs.

Petitioner contends that, with Morrissey as the sole trustee and sole participant of the Defined Benefit Plan since 1990, there is no violation of the exclusive benefit rule.  In support of its contention, petitioner asserts that two of three Defined Benefit Plan participants were paid their benefits in full in 1990.  Thus, petitioner asserts that the sole remaining participant, Morrissey, controls the Defined Benefit Plan and his retirement and could arrange for the plan to have liquid assets by repaying the loans to him at any time since he had assets with which to accomplish this.

In addition, petitioner contends that the prudent investor rules, a safe harbor when dealing with the exclusive benefit issue, have not been violated.  In support of its contention, petitioner asserts that Morrissey, the trustee, weighed the risks and benefits of making loans to Morrissey, the individual. Petitioner further asserts that if the loans turned out to be a bad investment for the Defined Benefit Plan, the only party who is harmed is Morrissey, the sole remaining Defined Benefit Plan participant.  Accordingly, petitioner contends that Morrissey,

the trustee, after weighing the risks and benefits, was entitled to have the trust make loans to Morrissey, as evidenced by promissory notes, without violating fiduciary standards.

Petitioner also maintains that the notes included a reasonable rate of interest and that Morrissey, at the time the loans were made, had the ability to repay. Petitioner further maintains that when his economic situation changed, he repaid the loans with real estate instead of cash. Consequently, petitioner contends that since Morrissey, as of 1990, was not of retirement age, it is premature to conclude that as of that date, the trust would not have funds available for distribution to him upon his retirement. Petitioner asserts that the real property interests transferred into the Money Purchase Plan and the Defined Benefit Plan as repayment of the loans have markedly appreciated in value to the point where it is reasonable to conclude that the investments were in fact prudent. Petitioner further asserts that a simple refinancing of the property could have provided for both liquidity and diversity whenever Morrissey chose to do so.[11]

Respondent contends that the investments in the 23 loans failed to provide the Defined Benefit Plan with a fair rate of return, sufficient liquidity, adequate security, and diversity of

---

[11]We note that many of petitioner's contentions apply to the Money Purchase Plan and not to the Defined Benefit Plan. See supra note 1. Morrissey transferred nothing of value to the Defined Benefit Plan.

investments.  Respondent further contends that the 23 loans were not isolated incidents but reflected an investment policy benefiting the plan trustee as an individual.  Additionally, respondent contends that the 23 loans did not comply with the Defined Benefit Plan provisions.[12]

Whether a plan has been operated for the exclusive benefit of employees and their beneficiaries is determined on the basis of the facts and circumstances.  See Feroleto Steel Co. v. Commissioner, 69 T.C. 97, 107 (1977); sec. 1.401-1(b)(3), Income Tax Regs.; see also Bernard McMenamy, Contractor, Inc. v. Commissioner, 442 F.2d 359 (8th Cir. 1971), affg. 54 T.C. 1057 (1970); Time Oil Co. v. Commissioner, 258 F.2d 237, 238-239 (9th Cir. 1958), remanding 26 T.C. 1061 (1956).  If a violation of the exclusive benefit rule is found, then we look to the totality of the transgressions that occurred in assessing whether it is an abuse of discretion for the Commissioner to disqualify the plan. The discretion to disqualify a plan should be exercised with restraint, however, because the Department of Labor and the Internal Revenue Service have a broad range of alternative remedies available to ensure that a trust is properly

---

[12]Again, we note that respondent has combined the Money Purchase Plan and the Defined Benefit Plan, as we have previously found that Morrissey made a series of six loans to himself from the Defined Benefit Plan assets.

administered.  See <u>Winger's Depart. Store, Inc. v. Commissioner</u>, <u>supra</u> at 887-888.

We previously have held that the standards for fiduciary behavior set forth in the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, sec. 404(a)(1), 88 Stat. 877, current version at 29 U.S.C. sec. 1104 (1994), may be used to help determine whether the exclusive benefit rule has been violated.  See <u>Ada Orthopedic, Inc. v. Commissioner</u>, T.C. Memo. 1994-606; see also <u>Calfee, Halter & Griswold v. Commissioner</u>, 88 T.C. 641, 652 (1987) ("the standards of title I and title II [of ERISA] were closely coordinated by Congress specifically to develop a unified set of rules").  ERISA section 404(a)(1) requires a plan fiduciary to discharge his or her duties for the exclusive purpose of (1) providing benefits to participants and their beneficiaries and (2) defraying reasonable expenses of administering the plan.  Additionally, the fiduciary must (1) perform those duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent investor acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, (2) diversify investments to minimize the risk of large losses, unless diversification clearly is not prudent under the circumstances, and (3) discharge those duties in accordance with the documents and instruments governing the plan to the

extent they are consistent with the provisions of ERISA title I. See id. The legislative history of ERISA section 404(a), however, cautions: "It is expected that courts will interpret the prudent man rule and other fiduciary standards bearing in mind the special nature and purposes of employee benefit plans intended to be effectuated by the Act." H. Rept. 93-533, at 12 (1973), 1974-3 C.B. 210, 221.[13] Thus, we must "recognize that a fiduciary's duties are circumscribed by Congress' overriding goal of ensuring 'the soundness and stability of plans with respect to adequate funds to pay promised benefits.'" Acosta v. Pacific Enters., 950 F.2d 611, 618 (9th Cir. 1991) (quoting 29 U.S.C. sec. 1001 (1988)).

The Department of Labor regulations state that a fiduciary will satisfy the prudent investor requirements of ERISA section 404(a)(1)(B) if the fiduciary (i) gives appropriate consideration to the relevant facts and circumstances of the investment or investment course of action and (ii) acts accordingly. See 29 C.F.R. sec. 2550.404a-1(b)(1) (1997). Pursuant to those regulations, "appropriate consideration" shall include, but is not necessarily limited to:

---

[13]The quoted material from H. Rept. 93-533, at 12 (1973), 1974-3 C.B. 210, 221, describes H.R. 2, 93d Cong., 2d Sess. sec. 111(b)(1) (1974), as reported by the House Committee on Education and Labor, on Oct. 2, 1973, which became ERISA sec. 404(a)(1).

(i)  A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio * * *, to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action, and

(ii) Consideration of the following factors * * *

(A)  The composition of the portfolio with regard to diversification;

(B)  The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

(C)  The projected return of the portfolio relative to the funding objectives of the plan.

29 C.F.R. sec. 2550.404a-1(b)(2).

The Department of Labor requirements appear consistent with criteria set forth by the Commissioner in Rev. Rul. 69-494, 1969-2 C.B. 88, for testing compliance with the exclusive benefit requirement of section 401(a)(2).  Those criteria are:  (1) Cost must not exceed fair market value at the time of purchase; (2) a fair return commensurate with the prevailing rate must be provided; (3) sufficient liquidity must be maintained to permit distributions in accordance with the terms of the plan; and (4) the safeguards and diversity that a prudent investor would adhere to must be present.  We previously have indicated that the criteria listed in Rev. Rul. 69-494, supra, although not binding on the Court, are relevant to a determination as to whether the prudent investor requirements have been satisfied.  See Winger's

Depart. Store, Inc. v. Commissioner, 82 T.C. 869 (1984); Feroleto

Steel Co. v. Commissioner, supra; see also Ada Orthopedic, Inc.

v. Commissioner, supra.

Additionally, in applying the prudent investor rule, it has

been stated:

> Under ERISA, as well as at common law, courts have focused
> the inquiry under the "prudent man" rule on a review of the
> fiduciary's independent investigation of the merits of a
> particular investment, rather than on an evaluation of the
> merits alone.  As a leading commentator puts it, "the test
> of prudence--the Prudent Man Rule--is one of conduct, and
> not a test of the result of performance of the investment.
> The focus of the inquiry is how the fiduciary acted in his
> selection of the investment, and not whether his investments
> succeeded or failed."  In addition, the prudent man rule as
> codified in ERISA is a flexible standard:  the adequacy of a
> fiduciary's investigation is to be evaluated in light of the
> "character and aims" of the particular type of plan he
> serves.  [Donovan v. Cunningham, 716 F.2d 1455, 1467 (5th
> Cir. 1983); fn. ref. omitted; citations omitted.]

Thus, the ultimate outcome of an investment is not proof that the

investment failed to meet the prudent investor rule.  See

DeBruyne v. Equitable Life Assur. Socy. of U.S., 920 F.2d 457,

465 (7th Cir. 1990); see also Norton Bankruptcy Law and Practice

2d, sec. 156:9 (1997-98).

By examining the totality of transgressions that Morrissey

committed, we can assess whether it was an abuse of discretion

for respondent to disqualify the Defined Benefit Plan.

Morrissey, as sole shareholder of petitioner--the plan sponsor--

failed to make required contributions to the Defined Benefit

Plan.  For the plan year ended October 31, 1989, the Schedule B

of Form 5500 reports the total present value of vested benefits for participants as of the end of the plan year as $335,384. Moreover, the Form 5500 reports that petitioner owes $231,796 in contributions which are more than 3 months overdue. Thus, the contributions petitioner owes to the Defined Benefit Plan represent more than two-thirds of the participants' vested benefits. For the plan year ended October 31, 1990, the Schedule B of Form 5500 reports the total present value of vested benefits for participants as of the end of the plan year as $341,583. In addition, the Form 5500 reports $257,639 in contributions that petitioner owes the trust which are more than 3 months overdue. Thus, the contributions petitioner owes to the Defined Benefit Plan represent 75 percent of the participants' vested benefits.

For the plan years ended October 31, 1988, 1989, and 1990, petitioner owed contributions to the Defined Benefit Plan of $188,983, $231,796, and $257,639, respectively. This pattern of increasing overdue contributions each plan year shows that petitioner was consistently not making contributions to the Defined Benefit Plan even though the participants' vested benefits were increasing. Moreover, on this record petitioner has not shown that it refrained from taking deductions for contributions to the Defined Benefit Plan which it was not making. The problem is thus exacerbated.

Morrissey essentially used the Defined Benefit Plan as a checking account, on which interest accumulated tax free, and not as a retirement vehicle. From February 8, 1984, through December 9, 1988, Morrissey, as trustee of the Defined Benefit Plan, made a series of six loans from the Defined Benefit Plan assets to himself, for a total of $105,000. The Forms 5500 for the plan years ended October 31, 1989 and 1990, report loans as of the beginning of each plan year of $129,031 and $152,112, respectively. The six notes all fail to state when payments are due or when repayments should be made. Furthermore, none of the six installment notes require Morrissey to provide security or collateral for the loans. Additionally, none of the installment notes state maturity dates.

It is clear from examining the activity in the Trust account at the Bank of New York that Morrissey was using the Defined Benefit Plan as a checking account for his personal needs rather than as a retirement plan for the exclusive benefit of petitioner's employees and beneficiaries. From February 8, 1984, through December 9, 1988, Morrissey repeatedly took loans from the Defined Benefit Plan leaving minimal cash balances. From February 12, 1988, forward the cash balance in the Defined Benefit Plan Trust account was less than $5,000, even though the vested benefits of participants as of the end of the plan years ended October 31, 1989 and 1990, were $335,384 and $341,583,

respectively. This repeated taking of loans from the Defined Benefit Plan and leaving minimal cash balances in the Trust account was clearly imprudent and contrary to the purpose of ERISA. The purpose of ERISA was not to establish a tax-exempt pocketbook for Morrissey.

Morrissey made no repayments on any of the six loans from the Defined Benefit Plan. The Form 5500 for the plan year ended October 31, 1990, reports total plan assets of $191,680 as of the beginning of the plan year, including $152,112 in loans to Morrissey and $646 in cash. Furthermore, it reports total plan assets of $179,628 as of the end of the plan year, including $137,270 in real estate and mortgages and $2,295 in cash. The Form 5500 seems to suggest that Morrissey repaid all or part of the $152,112 in loans that he owed to the Defined Benefit Plan with $137,270 in real estate. However, we previously found that Morrissey transferred his 50-percent interest in two parcels of unencumbered real estate to the Money Purchase Plan and that he never transferred any value to the Defined Benefit Plan to repay his loans from the Defined Benefit Plan assets. See Morrissey v. Commissioner, T.C. Memo. 1998-443. Moreover, the administrative record contains no deeds or other evidence that any real estate was transferred to the Defined Benefit Plan. Consequently, even though the Form 5500 reports that the Defined Benefit Plan holds

$137,270 in real estate at the end of the plan year, we find that Morrissey transferred no real estate to the Defined Benefit Plan.

Neither interest nor principal payments were ever made to the Defined Benefit Plan. As trustee of the Defined Benefit Plan, Morrissey made no attempt to collect any of the outstanding six loans. Rather than collecting on the loans, Morrissey signed a form titled "Employee's Waiver of Portion of Benefit Not Funded Upon Distribution of Plan's Assets Pursuant to Plan Termination Effective: September 26, 1990", in which he waived his right to any unfunded benefits, to the extent that the Defined Benefit Plan assets were insufficient to provide the actuarial equivalent of his normal retirement benefit on the date of benefit distributions. Consequently, Morrissey never paid any interest or principal on the loans, and when he terminated the Defined Benefit Plan, he intended not to repay his obligation to the Defined Benefit Plan. It was inconsistent with the prudent investor rule for the Defined Benefit Plan to have made those loans and then to have allowed them to remain outstanding under the circumstances. The purpose of ERISA is to provide retirement benefits, not to provide a tax-free checking account to Morrissey from which he can withdraw money at any time as loans and then waive his obligation to repay. Morrissey's waiver of his rights to any unfunded benefits, when most of his benefits under the Defined Benefit Plan remained unfunded, coupled with the

termination of the Defined Benefit Plan, was contrary to the purpose of ERISA.

In Winger's Depart. Store, Inc. v. Commissioner, 82 T.C. 869 (1984), the trustees of an employer-sponsored defined benefit pension plan lent a major portion of the trust's assets to the employer, through the employer's sole shareholder, to meet the company's working capital needs. The loans were unsecured, interest payments to the trust were delinquent, and most of the principal was not repaid. The sole shareholder and his spouse were cotrustees of the trust, and most of the benefits under the plan accrued to the sole shareholder. We found that the trust had not been operated for the exclusive benefit of the employees and their beneficiaries, and we upheld the Commissioner's determination that the related plan was no longer qualified under section 401(a).

In Ada Orthopedic, Inc. v. Commissioner, T.C. Memo. 1994-606, the trustees of an employer-sponsored defined benefit plan lent a substantial portion of the plan's assets through unsecured loans to participants, relatives, and friends of the trustees. Some of the loans were made or extended without written promissory notes, and principal and interest remained unpaid on some of the loans. In addition, the trust acquired real property by unrecorded quitclaim deeds without investigating title and subsequently lost that property upon foreclosure of preexisting

mortgages; the trust invested in a tax-shelter partnership in which one of the trustees acquired three loose diamonds, the largest of which could not be located; and the plan disbursed plan assets to nonparticipants without explanation. We found under those circumstances that the trust's investment practices violated the exclusive benefit rule. Accordingly, we upheld the Commissioner's determination that the plan was no longer qualified.

In <u>Shedco, Inc. v. Commissioner</u>, T.C. Memo. 1998-295, the trustee of an employer-sponsored defined benefit pension plan lent $2,250,000, representing approximately 90 percent of the plan's assets, through an unsecured loan to a construction company in which the trustee had served as executive vice president until his retirement. The proceeds from the loan were used for general working capital needs, and when the loan was made, the construction company could have obtained funds from several other sources. The trustee did not consult with counsel or with the plan's actuarial firm about making the loan before the plan lent the money to the construction company. The construction company agreed orally to make semiannual principal payments on the note of $250,000 each. It made two such payments, and it made monthly payments of interest in accordance with the terms of the note until it encountered problems in Arizona's real estate economy. The construction company's

inability to repay the loan resulted from a downturn in the real estate market and not from impropriety on its part.  We found that although the loan failed to meet the prudent investor test, it was an isolated violation of that test, did not exhibit indifference to the continued well-being of the plan, and was not an attempt to manipulate the plan's assets for the benefit of persons other than the plan's beneficiaries.  We therefore found that the loan did not violate the exclusive benefit rule.  Accordingly, we concluded that the extension of the loan did not cause the plan to fail to satisfy the requirements of sections 401(a) and 501(a).

Our examination of the facts in this case leaves no doubt that the Defined Benefit Plan was not managed for the exclusive benefit of the employees.  While the detailed facts of this case are not identical with those in <u>Winger's Depart. Store, Inc. v. Commissioner</u>, <u>supra</u>, or in <u>Ada Orthopedic, Inc. v. Commissioner</u>, <u>supra</u>, the ultimate thrust of those cases is equally applicable here.  The facts in <u>Winger's</u> and <u>Ada Orthopedic</u> reveal investment philosophies that were not aimed primarily at providing benefits for the employees and their beneficiaries in general but instead were aimed at benefiting the plan sponsors or certain individuals.  Indeed, the investment practices in those cases involved flagrant violations of the exclusive benefit rule.

There is no question but that improper trust administration and investment policies may result in violations of the exclusive benefit rule. See Winger's Depart. Store, Inc. v. Commissioner, supra at 886. As in Winger's Depart. Store, Inc. v. Commissioner, supra at 882, a major portion of the assets of petitioner's pension trust was lent to Morrissey, petitioner's sole shareholder and trustee of the Defined Benefit Plan. As in Winger's Dept. Store, Inc. v. Commissioner, supra at 882, during the years in issue, interest thereon not only was delinquent but also was never paid, and all of the principal remains outstanding.

The instant case is distinguishable from Shedco, Inc. v. Commissioner, supra. The loan in that case was sought because the trustee believed it would be a good investment for the plan, and not because he sought a benefit for himself (other than as a beneficiary of the plan). The loan proceeds were not diverted for the personal benefit of the plan trustee. Interest was stated on the note at market rate, and payments were being made until the construction company began to experience financial difficulties. Moreover, the construction company's inability to repay the loan resulted from a downturn in Arizona's real estate market and not from impropriety on its part.

In the instant case, Morrissey's notes were backed by nothing more than Morrissey's vested Accrued Benefit.

Furthermore, the loan proceeds flowed back to Morrissey. Moreover, neither interest nor principal payments were ever made to the Defined Benefit Plan. Indeed, when the Defined Benefit Plan was terminated, nothing of any value was transferred to the Defined Benefit Plan. Rather, Morrissey signed a form titled "Employee's Waiver of Portion of Benefit Not Funded Upon Distribution of Plan's Assets Pursuant to Plan Termination Effective: September 26, 1990", in which he waived his right to any unfunded benefits, to the extent that the Defined Benefit Plan assets were insufficient to provide the actuarial equivalent of his normal retirement benefit on the date of benefit distributions. By allowing himself to obtain loans from the Defined Benefit Plan and then waiving his right to unfunded benefits at termination, Morrissey used the Defined Benefit Plan assets as a ready source of cash for his immediate personal needs as opposed to income for retirement.

In our opinion, the failure to make required contributions owed to the Defined Benefit Plan, the lending of a large portion of the Defined Benefit Plan's liquid assets through loans to the trustee secured only by his vested Accrued Benefit, the failure to pay any interest or repay the principal by the date of termination of the Defined Benefit Plan, and the waiver by the trustee of his right to any unfunded benefits combine to prove that the Defined Benefit Plan was not managed for the exclusive

benefit of the employees, but for the immediate as opposed to the retirement benefit of Morrissey. The Defined Benefit Plan was used as a personal bank account by Morrissey for loans that were made without regard to risk or prior repayment history. These facts support respondent's disqualification of the Defined Benefit Plan.

Also, and perhaps more important, our decision is based on a determination that the entire investment philosophy of the Defined Benefit Plan was aimed not at providing benefits for the employees but at making capital available to Morrissey. The manipulation of pension plan assets by a trustee who is also the sole shareholder of the plan sponsor is a clear example of an exclusive benefit rule violation. See Ada Orthopedic, Inc. v. Commissioner, T.C. Memo. 1994-606.

In the instant case, we find the indifference toward the continued well-being of the plan that we found in Winger's Depart. Store, Inc. v. Commissioner, 82 T.C. 869 (1984), and Ada Orthopedic, Inc. v. Commissioner, supra. Under the circumstances of this case, we hold that, because petitioner's Defined Benefit Plan did not operate for the exclusive benefit of employees for the plan years ending October 31, 1990, and thereafter, it failed to be qualified during those years under section 401(a) and hence failed to satisfy the requirements of section 501(a) tax

exemption.  Accordingly, respondent properly revoked the qualified status of the Defined Benefit Plan.

We have carefully considered all remaining arguments made by the parties for holdings contrary to those expressed herein, and, to the extent not discussed above, find them to be irrelevant or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.